# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No._____

ESTATE OF ASHLEY JO RAISBECK, by and through its Personal Representative Jamie
Raisbeck;
JAMIE RAISBECK, individually,

   Plaintiffs,

v.

JEFFERSON COUNTY, COLORADO[1];
BOARD OF COUNTY COMMISSIONERS OF JEFFERSON COUNTY;
JEFFERSON COUNTY SHERIFF'S OFFICE;
JEFFERSON COUNTY SHERIFF REGGIE MARINELLI, in her official capacity;
VITALCORE HEALTH STRATEGIES, LLC;
SHANDA N. BAER, LPN;
REBECCA A. STRONG, LPN;
NICOLE M. MAYOROS, LPN;
CAROLINE RYAN, LPN;
CASEY CASTANEDA, LPN;
CARRIE EARLE, LPN;
ESMERALDA ZIEGELMANN, RN;
CATHERINE ROWE, RN;
MONICA JARRELL, NP;
DEPUTY NICHOLE LEIGH HUDSON;
DEPUTY DEBBIE GONZALES;
DEPUTY SADIE JO SCOTT;
DEPUTY STEPHANIE WHITING;

---

[1] "Jefferson County, Colorado," is the correct name of the governmental entity Defendant. There is a split of opinion among some judges in this district and elsewhere regarding the proper named municipal defendant when suing a County under Section 1983. Some judges require that plaintiffs name the Board of County Commissioners and/or the sheriff in his/her official capacity to name a Colorado county as a Section 1983 defendant. It is the intent of this civil rights action to hold the County liable regardless of how its denominated. If the Court in this matter ultimately prefers or requires Plaintiffs to name as Defendants only the "Board of County Commissioners of Jefferson County" and/or "Sheriff Reggie Marinelli in her official capacity" to sue Jefferson County, or some other entity in order to obtain municipal liability against Jefferson County, Plaintiffs will substitute or voluntarily dismiss parties, and this shall serve as notice of the lawsuit and the factual and legal bases of the claims to those putative County municipality Defendants and their lawyers.

1

DEPUTY RYAN BORUS;
JEFFERSON COUNTY ATTORNEY REBECCA KLYMKOWSKY;
JEFFERSON COUNTY ATTORNEY KIMBERLY SORRELLS;
JEFFERSON COUNTY DISTRICT ATTORNEY ALEXIS KING;
JOHN AND JANE DOES No. 1-20;

    Defendants.

---

## COMPLAINT AND JURY DEMAND

---

**TO:**    **The Defendants above-named and their respective attorneys. This is an action for damages brought pursuant to 42 U.S.C. §1983, Fourteenth Amendment of the United States Constitution.**

## I. INTRODUCTION

1. On December 16, 2023, Ashley Jo Raisbeck, a 27-year-old inmate housed at the Jefferson County Detention Facility ("JCDF"), died alone, scared, and in agony from severe dehydration, anaphylactic shock, and intussusception because Nurse Practitioner Monical Jarrell of VitalCore Health Strategies, LLC ("Vitalcore") had poisoned and overdosed her with an antibiotic to which she was allergic – a synthetic type of penicillin in the cephalexin category that goes by the brand name, Keflex.

2. This in-custody death was wholly **preventable** because jail medical records flagged the allergy, and Ms. Raisbeck had previously refused the medication at JCDF in writing. But Ms. Jarrell, and the rest of her staff that she was supposed to oversee, ignored the FDA Black Box warnings and all signs and symptoms of medical decline and anaphylactic shock.

2

3.  Defendants did not just engage in negligence, but in willful and wanton deliberate
    indifference to Ms. Raisbeck's serious medical needs in violation of the Fourteenth
    Amendment to the United States Constitution. See *Estelle v. Gamble*, 429 U.S. 97
    (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994).  Defendants **caused** the medical crisis
    with a blunder so far below the medical standard of care that a lay person could easily
    identify the liability.  And after causing the crisis, Defendants ignored Ms. Raisbeck's
    declining condition, obvious severe dehydration, concerning vital signs, pain, cramping,
    black vomit, low blood pressure, bowel obstruction, cramping, neurological, and other
    obvious symptoms of life threatening illness - for four days.

4.  When Ms. Raisbeck was at Stage 4 anaphylactic shock and so severely dehydrated that it
    was apparent she needed immediate IV fluids – Licensed Practical Nurse ("LPN")
    Shanda Baer **could not get a blood pressure reading or hear a pulse**.  That's when LPN
    Baer and Deputy Gonzales, who was aware there was no blood pressure or pulse,
    **walked away from Ms. Raisbeck for nearly an hour** to "finish their rounds" instead of
    calling 911 and engaging Emergency Medical Services ("EMS").  This level of deliberate
    indifference truly shocks the conscience.

5.  Had Ms. Raisbeck received timely care, even after VitalCore's poisoning, she would
    likely be alive and well today.  She certainly would not have spent the last days of her life
    in debilitating pain, disoriented, frightened, and alone in a jail cell.

## II. JURISDICTION AND VENUE

6.  Jurisdiction exists under 28 U.S.C. §§ 1331 and 1343 for federal claims brought pursuant to 42 U.S.C. § 1983.

7.  Supplemental jurisdiction exists under 28 U.S.C. § 1367 for state-law claims, and because the violations of federal law alleged are substantial and the pendent causes of action derive form a common nucleus of operative facts.

8.  Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred pursuant to 42 U.S.C. § 1988.

9.  Venue is proper in this District under 28 U.S.C. § 1391(b) because all events occurred in Jefferson County in the State of Colorado, and all of the parties were residents of the State of Colorado at all relevant times.

10. Plaintiffs completed all required pre-filing steps, including timely written Colorado Governmental Immunity Act ("CGIA") notice on June 11, 2024.  Sovereign immunity is therefore waived for Plaintiffs' state law claims against the governmental defendants. See Colo. Rev. Stat.  § 24-10-106(1)(b) and (e) and 24-10-109.  As VitalCore is a private company, no notice of claim was required under the CGIA, but was nevertheless sent to them as a courtesy.

## III. PARTIES

### Plaintiffs

11. At all relevant times subject to this litigation, the decedent, Ashley Jo Raisbeck, was a citizen of the United States and a resident domiciled in the State of Colorado.  At all relevant times after her passing, Jamie Raisbeck, biological mother of Ashley Jo Raisbeck, was personal representative for her daughter's Estate.  Plaintiff Estate of

4

Ashley Jo Raisbeck appears by and through Personal Representative, Jamie Raisbeck, who is also a resident of Jefferson County, Colorado.

12. Plaintiff Jamie Raisbeck was Ashley Jo Raisbeck's mother.  At all relevant times, Jamie Raisbeck was a citizen of the United States and a resident of and domiciled in Jefferson County in the State of Colorado.

**Defendants**

13. Defendant Jefferson County is a political subdivision chartered under the laws of the State of Colorado and is a "person" subject to suit under Title 42 § U.S.C. Section 1983. Jefferson County operates and oversees the Jefferson County Detention Facility ("JCDF") located at 200 Jefferson County Parkway, Golden, Colorado.

14. Defendant Jefferson County Sheriff's Office is responsible for jail operations and its employees, and is located at 500 Jefferson County Parkway, Golden, Colorado.

15. Defendant Sheriff Reggie Marinelli, in her official capacity, is the elected Sheriff of Jefferson County, and is responsible for the Jefferson County Sheriff's Department and JCDF.  She is responsible for any supervision, training, policies, practices or customs pertaining to the operation of JCDF and is ultimately responsible for medical care of detainees, and is charged with a serious duty of care.

16. Defendant Jefferson County Board of County Commissioners ("BOCC") act collectively as the governing board Jefferson County, as authorized by the State of Colorado.  BOCC is responsible for budgetary, contractual, supervisory, and policy decisions affecting jail operations, including but not limited to the contract with VitalCore.

17. Defendant Nichole Leigh Hudson, a deputy at JCDF, was at all times relevant to the subject matter of this litigation a citizen of the United States and resident of and domiciled in Colorado, and was acting within the scope of her official duties and under color of state law in her named capacity, employed by Jefferson County.

18. Defendant Debbie Gonzales, a deputy at JCDF, was at all times relevant to the subject matter of this litigation a citizen of the United States and resident of and domiciled in Colorado, and was acting within the scope of her official duties and under color of state law in her named capacity, employed by Jefferson County.

19. Defendant Sadie Jo Scott, a deputy at JCDF, was at all times relevant to the subject matter of this litigation a citizen of the United States and resident of and domiciled in Colorado, and was acting within the scope of her official duties and under color of state law in her named capacity, employed by Jefferson County.

20. Defendant Stephanie Whiting, a deputy at JCDF, was at all times relevant to the subject matter of this litigation a citizen of the United States and resident of and domiciled in Colorado, and was acting within the scope of her official duties and under color of state law in her named capacity, employed by Jefferson County.

21. Defendant Ryan Borus, a deputy at JCDF, was at all times relevant to the subject matter of this litigation a citizen of the United States and resident of and domiciled in Colorado, and was acting within the scope of his official duties and under color of state law in her named capacity, employed by Jefferson County.

22. Defendants Jefferson County, Jefferson County Sheriff's Department, Sheriff Reggie Marinelli in her official capacity, BOCC, and the individual Deputies are referred to

collectively as the "Jefferson County Defendants". Jefferson County Defendants are

responsible for the oversight, supervision, and training of staff at the JCDF, including

employees of VitalCore Health Strategies, LLC ("VitalCore"). The Jefferson County

Defendants are properly sued under 42 U.S.C. § 1983 with respect to deliberately

indifferent policies and practices for the care and treatment of persons detained at the

JCDF, as well as for the policies and practices of VitalCore acting as the contractual

delegated medical decision makers.

23. At all relevant times, Jefferson County Defendants had a nondelegable duty imposed by

the Colorado and United States Constitutions to provide adequate medical care to inmates

and detainees at JCDF. The Jefferson County Defendants are liable under the

nondelegable duty doctrine for the deliberate indifference of its own employees and

agents and of Defendant VitalCore, its agents and contracted medical care providers, and

its employees or contractors. By contracting with VitalCore, Jefferson County

Defendants have adopted and are liable for VitalCore's deliberately indifferent policies,

training, practices, habits, protocols, customs, and failure to adequately train and/or

supervise their employees and contractors with respect to the serious medical needs of

inmates and detainees like Ashley Raisbeck.

24. Defendant VitalCore Health Strategies, LLC is a Kansas corporation with its principal

place of business located at 719 SW Van Buren Street, Suite 100, Topeka, Kansas 66603.

Its registered agent in Colorado is Corporation Service Company located at 1900 W.

Littleton Blvd, Littleton, CO 80120.

25. At all times relevant, VitalCore contracted with Jefferson County Defendants to provide

medical and mental health services to inmates and detainees at JCDF. Upon information

and belief, the initial contract with Jefferson County is dated November 8, 2021, and was renewed by Second Amendment and then signed and dated by Defendant Sheriff Marinelli on February 2, 2023 for a year.  This covers all relevant times that Ashley Raisbeck was incarcerated at JCDF.  At all relevant times, VitalCore was responsible for the oversight, supervision, and training of all medical staff at JCDF, including the Individual Defendants named in this matter – and was responsible for medical and mental health care of inmates and detainees housed at JCDF.

26. Defendant VitalCore is a private corporation, and neither it nor any of its employees or contractors are entitled to immunity under the Colorado Governmental Immunity Act on Colorado state law claims or qualified for other immunity on the federal law claims.[2]

---

[2] Plaintiffs contend that institutional standards of liability based on respondeat superior should apply to private entities, such as VitalCore, in §1983 actions, and that cases such as *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) are wrongly decided and should be modified or reversed. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional rights.") Applying the heightened standards of Monell – designed to protect governmental entities – to private corporate conduct is contrary to public policy, including policy concerns outlined by the Supreme Court in *Monell* and its progeny. Several district courts in the Tenth Circuit have acknowledged *Shields*'s criticism of the application of *Monell* to private corporations. *Sanders*, 138 F. Supp. 3d at n.3; *Khan*, 2021 U.S. Dist. LEXIS 5596 at *11 n.13; *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1341 (N.D. Okla. 2014). In *Herrera v. Santa Fe Public Schools*, the District Court of New Mexico discussed *Shields*, acknowledging that "[t]here is a fair question whether this is a wise rule." 41 F. Supp. 3d at 1179. In *Revila v. Glanz*, the Northern District of Oklahoma stated that *Shields*'s reasoning "provides potent arguments for *not* extending *Monell* to private corporations" but stated that it must follow Tenth Circuit precedent, which holds that "*Monell* extends to private corporations and thus [private corporations] cannot be held liable on a *respondeat superior* basis for their employees' conduct." 8 F.Supp.3d at 1341. While several opinions throughout the Tenth Circuit question the soundness of extending *Monell* to private corporations, these opinions also acknowledged that it currently remains settled law. *See Carr v. Elder*, 2022 U.S. Dist. LEXIS 247870, *19-*20 (D. Colo.). In any event, all Defendants in this matter are legally culpable, including VitalCore, whichever standard of institutional liability is applied.

27. At all relevant times, VitalCore was acting under the color of state law and performing a
central function of the state in the State of Colorado.

28. At all times relevant to the subject matter of this litigation, the following VitalCore staff
were citizens of the United States and residents of and domiciled in Colorado, were
acting within the scope of their official duties and under color of state law in their named
capacities, and were employed by or an independent contractor for VitalCore and
Jefferson County.  The Licensed Practical Nurses are known as "LPN"s, the Registered
Nurses are known as "RN"s, and the Nurse Practitioner is known as "NP".  VitalCore
staff who are defendants to this action and their capacity include:

    a.  Shanda N. Baer, Licensed Practical Nurse (LPN)

    b.  Rebecca A. Strong, Licensed Practical Nurse (LPN)

    c.  Nicole M. Mayoros, Licensed Practical Nurse (LPN)

    d.  Caroline Ryan, Licensed Practical Nurse (LPN)

    e.  Casey Castaneda, Licensed Practical Nurse (LPN)

    f.  Carrie Earle, Licensed Practical Nurse (LPN)

    g.  Esmeralda Ziegelmann, Registered Nurse (RN)

    h.  Catherine Rowe (RN)

    i.  Monica Jarrell, Nurse Practitioner (NP)

    j.  Additional John and Jane Doe medical staff, yet to be identified as employees or
agents of Jefferson County Defendants and/or VitalCore, whose identities or roles

have not been provided to Plaintiffs or confirmed, but who are or should be known to Jefferson County Defendants and/or VitalCore, shall be identified and added herein upon discovery.

29. At all times relevant, Monica Jarrell, NP, was responsible for ordering medications, overseeing clinical decisions, supervising nursing staff, and administering treatment protocols. She is the VitalCore employee who initiated the contraindicated cephalexin antibiotic despite well documented allergy warnings, and Ms. Raisbeck's written refusal of the drug. She is the one who caused Ms. Raisbeck to overdose – but not from an illicit drug. From an antibiotic Ms. Raisbeck should never have had.

30. Defendant Rebecca Klymkowsky, the Jefferson County Attorney for the Sheriff's Office who unlawfully disclosed Protected Health Information ("PHI") regarding Ashley Raisbeck, was at all times relevant to the subject matter of this litigation a citizen of the United States and resident of and domiciled in Colorado, and was acting within the scope of her official duties and under color of state law in her named capacity, employed by Jefferson County.

31. Defendant Kimberly Sorrells, the Jefferson County Attorney who supervised Defendant Rebecca Klymkowsky, was at all times relevant to the subject matter of this litigation a citizen of the United States and resident of and domiciled in Colorado, and was acting within the scope of her official duties and under color of state law in her named capacity, employed by Jefferson County. Ms. Sorrels at all times relevant was vicariously liable for the actions of her employee, Rebecca Klymkowsky.

32. Defendant Alexis King, the Jefferson County District Attorney who unlawfully disclosed Protected Health Information ("PHI") regarding Ashley Raisbeck in the CIRT Report from June 20, 2024, was at all times relevant to the subject matter of this litigation a citizen of the United States and resident of and domiciled in Colorado, and was acting within the scope of her official duties and under color of state law in her named capacity, employed by Jefferson County.

33. Additional John and Jane Doe No. 1-20 medical/VitalCore staff and Jefferson County staff, yet to be identified as employees or agents of Jefferson County Defendants and/or VitalCore, whose identities or roles have not been provided to Plaintiffs or confirmed, but who are or should be known to Jefferson County Defendants and/or VitalCore, shall be identified and added herein upon discovery.

34. In referencing the various Defendants in the body of this complaint, "Jefferson County Defendants" will include: Jefferson County, Jefferson County Board of County Commissioners ("BOCC"), Jefferson County Sheriff's Office ("JCSO"), Sheriff Reggie Marinelli, and the individual deputies, who may also be referred to as the "Deputy Defendants". "Medical Defendants" will include VitalCore Health Strategies, LLC, LPN Shanda N. Baer, LPN Rebecca A. Strong, LPN Nicole M. Mayoros, LPN Caroline Ryan, LPN Casey Castaneda, LPN Carrie Earle, RN Esmeralda Ziegelmann, RN Catherine Rowe, NP Monica Jarrell. "Jefferson County Attorneys" will include County Attorney Rebecca Klymkowsky, County Attorney Kimberly Sorrells, and District Attorney Alexis King. Reference to the "Jefferson County Defendants", "Medical Defendants", or "All Defendants" will specifically not include the Jefferson County Attorneys, as there is only one claim that pertains to them involving the release of Private Health Information.

## IV. LEGAL FRAMEWORK

**35.** Plaintiffs bring claims under 42 U.S.C. § 1983 for violations of the Fourteenth

Amendment. A detainee's right to adequate medical care and safety is clearly established.

*Estelle v. Gamble*, 429 U.S. 97 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994).

36. Deliberate indifference exists when officials know of and disregard an excessive risk to

an inmate's health or safety. *Farmer*, 511 U.S. at 837; *Mata v. Saiz*, 427 F.3d 745, 751

(10th Cir. 2005).

37. A medical need is "sufficiently serious" where failure to treat it results in substantial

harm, including severe pain, prolonged suffering, or a significant risk of death. *Sealock v.

Colorado*, 218 F.3d 1205 (10th Cir. 2000).

38. Deliberate indifference includes:

**(a)** failure to provide timely medical treatment;

**(b)** failure to monitor a deteriorating condition;

**(c)** delayed emergency response;

**(d)** refusal to transport a detainee for needed care;

**(e)** reckless disregard of symptoms.

See *Kellum v. Mares*, 657 F. App'x 763 (10th Cir. 2016); *Mata*, 427 F.3d at 753–55.

39. Jail officials violate clearly established law when they fail to act in the face of visible

medical deterioration such as vomiting, inability to hydrate, collapse, or neurological

compromise. *Sealock*, 218 F.3d at 1210; *Lopez v. LeMaster*, 172 F.3d 756 (10th Cir.

1999).

40. Under the **state-created danger doctrine**, officials are liable where their <u>**affirmative conduct**</u> increases a detainee's vulnerability to harm. *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001); *Armijo v. Wagon Mound*, 159 F.3d 1253, 1262–63 (10th Cir. 1998).

41. State-created danger applies where officials:

    **(a)** place an individual in a position of known danger;

    **(b)** remove avenues of medical help; or

    **(c)** act with recklessness that creates or heightens danger.

    *Estate of B.I.C. v. Gillen*, 761 F.3d 1099 (10th Cir. 2014).

42. Municipal liability arises when a custom, policy, or failure to train is the moving force behind a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

43. A municipality is liable when its policymakers:

    **(a)** maintain inadequate training;

    **(b)** perpetuate unconstitutional customs;

    **(c)** fail to supervise; or

    **(d)** ratify unconstitutional conduct.

    *City of Canton v. Harris*, 489 U.S. 378 (1989); *Connick v. Thompson*, 563 U.S. 51 (2011).

44. Inadequate training gives rise to liability where the need for better training is "so obvious" that failure to provide it constitutes deliberate indifference. *Canton*, 489 U.S. at 390.

45. Delayed or nonexistent emergency medical response violates clearly established Fourteenth Amendment rights. *Sealock*, 218 F.3d at 1209; *Mata*, 427 F.3d at 756.

13

46. A mother has a clearly established Fourteenth Amendment right to familial association with her child. *Trujillo v. Bd. of County Comm'rs*, 768 F.2d 1186, 1189–90 (10th Cir. 1985).

47. Unlawful disclosure of private medical information violates constitutional privacy protections. *Eastwood v. Dep't of Corrections*, 846 F.2d 627 (10th Cir. 1988); *A.L.A. v. West Valley City*, 26 F.3d 989 (10th Cir. 1994).

48. Disability discrimination claims are governed by the ADA and Rehabilitation Act, which prohibit denial of benefits or services because of disability and require reasonable accommodation. *Robertson v. Las Animas County Sheriff's Office*, 500 F.3d 1185 (10th Cir. 2007); *Gohier v. Enright*, 186 F.3d 1216 (10th Cir. 1999).

49. Colorado recognizes **loss-of-chance** liability when negligence deprives a patient of a substantial probability of survival. *Sharp v. Kaiser Found. Health Plan*, 710 P.2d 1153 (Colo. 1985).

50. Each of the legal doctrines above was clearly established long before December 2023, and Defendants' conduct violated each of those clearly established rights with regard to Ashley Jo Raisbeck's December 2023 medical crisis and death at JCDF.

## V. FACTUAL BACKGROUND / NARRATIVE TIMELINE

### A. Ashley Raisbeck was a beloved daughter, sister, aunt, and granddaughter.

51. Ashley Raisbeck was only 27 years old when she died an agonizing and preventable death - alone and in excruciating pain inside the JCDF.

52. Ms. Raisbeck was born to Jamie and Evan Raisbeck on July 16, 1996 in Tennessee and is survived by her mother, Jamie; father Evan; sisters Amanda and Aleah; her niece Jolee; her nephews Javier, Michael, and Koda; her grandparents Rhonda, Mike, and Gary; and

other beloved family members. Her grandparents and parents have endured unspeakable

pain with her passing before them.



53. Ashley was an amazing athlete in high school and beyond. She helped pave the way for

women wrestlers in Colorado. There weren't very many until she and her sister, Amanda,

demonstrated that women could engage in this sport. Ashley was extremely smart and a

good student – nearly a straight A student. She was creative and artistic, always making

crafts of all kinds. She was courageous and independent. If she was told she couldn't do

something, she would rise to the occasion and prove that she could.

54. Ashley was extremely close to her brother and sisters. If they ever needed her, she was

there without question no matter the situation because she had a heart of gold and was

selfless and would give them the shirt off her back. She would do without if she could

help somebody else by giving what little she had. She was affectionate and loving – and

by all accounts gave the best hugs in the world.  She was also very protective of her little

brother, Josh, from the time he was born.



55. Ashley's life changed forever when tragedy struck in 2020.  Ashley's little brother Josh,

who was her kindred spirit and side kick for life, was violently murdered by a stabbing.

This loss came on the heels of the loss of two pregnancies in 2018 and 2019.  Ashley

used drugs and alcohol to numb the pain of her broken soul.  But even in that blur of

pain, she told her mother every day that she desperately wanted to get clean and to

become a Licensed Addiction Counselor for other addicts – because she felt that

counselors could only be effective if they had lived the cycle of addiction.  Ashley had no

judgment for others and their struggles and was outgoing, with a contagious laugh and

deep compassion – so her mother thought she would excel at such an endeavor.  Jamie
was Ashley's biggest cheerleader and was convinced she would beat her addiction.

56. Ashley's mother saw many signs of her daughter working to get clean, because it was all
that she talked about.  Even in September 2023 – just months before her death – Ashley
looked healthy and beautiful.  *See photo below from September 17, 2023*.  But her future
was ruthlessly taken away from her at the JCDF just three months later in December
2023.



57. Ashley wanted to work with her mother to create a non-profit organization that would
help families of murder victims, like their own family, to promote healing and to be able
to bring their bodies home for burial.  Even as she struggled, Ashley was focused on how

to help others – and how to keep her brother's memory alive.  She was always making crafts in his memory or visiting the cemetery.

58. Many people lost an activist who would have made their own struggles easier.  And Jamie Raisbeck, in an unspeakable tragedy, lost a second child.  And now it is Jamie Raisbeck who watches over the gravesites of her two lost children – in unbearable pain.

**B.  Information regarding the arrest in Wheat Ridge has been concealed.**

59. Information regarding Ms. Raisbeck's arrest by Wheat Ridge Police Department on December 12, 2023 has been withheld and concealed.  Upon information and belief, she was arrested by Wheat Ridge Police Department on December 12 or 13, 2023 on a warrant from Lakeside regarding petty misdemeanors.

60. Although the police agency information should have been part of the Critical Incident Response Team ("CIRT")  file that County Attorney Rebecca Klymcowsky provided Plaintiff's counsel – it was not.

61. In a July 21, 2025 email to Klymcowsky about the missing Wheat Ridge Body Cam footage, she responded, "The Critical Incident Response Team ("CIRT") is housed in the District Attorney's Office. The Sheriff's Office can release those records it has created, but we do not release other agencies' records. This is to ensure that requestors receive complete and accurate records from the agency of origin. As a result, the Sheriff's Office's response will include its own records but no other agencies." July 21, 2025.

62. But on October 20, 2025 when Plaintiff's counsel requested the body cam footage, Wheat Ridge Police Records responded "No records exist".  A follow-up contact with Randy Carroll in Wheat Ridge Records informed us that Ms. Raisbeck's court case had been

sealed, and therefore could not be released.  We were also informed that this was to

protect the information from "ambulance chasing attorneys".

63. ICCES court filing system once showed that Ms. Raisbeck's case number 23M6755, in

which a complaint was not filed with the court until December 19, 2023 (3 days after Ms.

Raisbeck's death), had been inexplicably sealed – for a dead person (with respect to a

case in February 2024, FTA).  It is believed this would require the District Attorney's

Office to file a motion to seal that case.  But Wheat Ridge claims the sealed case excuses

them from releasing body worn camera footage regarding the arrest.

64. Presumably, the arrest footage and police report three days before Ms. Raisbeck died

would be directly relevant to a CIRT report and investigating whether law enforcement

was in any way involved in Ms. Raisbeck's death.

65. And yet – the CIRT Report mentions nothing about Ms. Raisbeck's arrest or clearance of

arresting officers.

**C. Ms. Raisbeck was arrested and detained at JCDF in December 2023, but Court
Proceedings Establish Ashley's condition during the period of the fatal medical neglect**

66.  Ms. Raisbeck's experience with drug addiction caused her to be detained multiple times

over the course of 2023 for petty offenses, with no criminal record to speak of before she

lost her brother.  She was in and out of the JCDF in February, March, June, July, and

again in December - when she was arrested by Wheat Ridge Police Department.

67. When Ms. Raisbeck appeared for court on December 13, 2023 – Judge Magid did not

proceed with the hearing because she had concerns about Ms. Raisbeck's appearance that

morning.  The judge continued the case for a week.  Everyone assumed this was drugs –

but Ms. Raisbeck's medical emergency was just beginning.

68. The next day on December 14, 2023, Judge Goman inexplicably accepted a plea from Ms. Raisbeck, even though she objected to the factual basis and was being represented by an unlicensed student.  Ms. Raisbeck was given 30 days and remained in the jail that had provided zero addiction support all year.

69. Ms. Raisbeck appeared via Webex from the jail, which JCDF's lazy policy.  This isolates inmates who might need medical care - who can only be seen on a tiny screen and are not seen personally by the judge, the district attorney, the public defender, or family.  It allows JCDF to hide the severe medical and policy problems, as well as the problems with VitalCore, from the outside world.[3]

70. The court documentation on December 14, 2023 shows no notation of medical crisis, no intoxication indicators, and no reported medical instability at the time of her appearance—contradicting VitalCore's subsequent narrative that she was in "withdrawal" or "overdose" throughout her detention.  If so – Ms. Raisbeck was in no condition to be entering a plea agreement in three of her cases.

71. The 2023 court filings establish that Ashley entered the jail in stable condition and despite a continuance on the 13th, she took a plea on the 14th, which directly contradicts Defendants' later attempt to blame her death on substance use or withdrawal rather than the jail's negligence.  This record supports Plaintiffs' allegation that her rapid decline was caused entirely by Defendants' administration of a contraindicated antibiotic, the untreated anaphylaxis, dehydration, and the repeated delays in emergency medical care.

---

[3] There is apparently a policy that inmates must request to appear in person for court appearances ahead of time, which is not constitutional.

72. The judicial advisement hearing confirms that Ms. Raisbeck communicated clearly, responded appropriately, and showed no indicators of medical crisis - establishing that her fatal decline began only after the contraindicated antibiotic, cephalexin (Keflex), was repeatedly administered by Defendants.

**D. Jail medical staff failed to monitor Ms. Raisbeck's obvious serious medical needs or allergies – and poisoned her with penicillin.**

73. On the day that Ms. Raisbeck was booked into JCDF on December 13, 2023, Defendant LPN Casey Castaneda completed a Medical and Behavioral Health Admission Care Screen at 3:24 AM.  She confirmed that Ms. Raisbeck had **allergies to penicillin ("PCN"),** Vicodin and Codeine (allergies that were already in her jail medical record) – and that she had asthma.[4]  Castaneda noted sores on her legs, arms and face.  During medical intake, LPN Casey Castaneda collected Ms. Raisbeck's statements regarding recent substance use and performed a urine drug screen, which returned positive as expected.  Castaneda described Ms. Raisbeck as "alert", clear speech, "calm and cooperative" and oriented to time, place and person.  She reported pupil size at 4 on both eyes.

| 2322910 | Medical & Behavioral Health Admission Care Screen - HA-2.0 | Do you have any allergies? | | Yes (INDICATE ALLERGY and TYPE OF REACTION) (PCN, Vicodin, Codeine ) | Castaneda, LPN, Casey | 12-13-2023 3:24 am |
|---|---|---|---|---|---|---|

74. Based solely on this information, LPN Castaneda initiated withdrawal monitoring, including:

---

[4] "PCN" is a known medical abbreviation for the entire class of penicillin antibiotics. The information was noted in the VitalCore electronic medical record database known as CorEMR. Once entered into CorEMR, the allergy information transferred to VitalCore's electronic medication administration record ("eMAR"). The information was readily available to all nursing staff members and healthcare professionals responsible for the medical care of Ashley Raisbeck.

- CIWA-B alcohol detox protocol, an accreditation-required protocol established and reviewed by Michelle Klaus, MD.

- COWS opiate detox protocol, an accreditation-required protocol established and reviewed by Michelle Klaus, MD.

- A "3-day clear liquid diet".

75. Following clearance by LPN Casey Castenada and a jail counselor, Ms. Raisbeck was classified for general population housing with CIWA and COWS protocol orders requiring health status assessments three times each day for the first 72 hours and a clear liquid diet.

76. Within hours of the initial intake interview at 07:01 AM, Advanced Nurse Practitioner started Ms. Raisbeck on 1000 mg of an antibiotic called cephalexin (Keflex) to be administered twice daily by mouth.

77. Cephalexin is a known β-lactam synthetic penicillin antibiotic with a similar chemical make up to natural penicillin. Patients with allergies to natural penicillin antibiotics can cross-react to cephalexin therapy, making it an obvious contraindicated antibiotic for Ashley Raisbeck. The medication error was not corrected by any of the nursing staff during Ms. Raisbeck's incarceration.

78. Monica Jarrell made this same dire mistake in ordering Keflex when Ms. Raisbeck was in custody in February of 2023.  This was discontinued when Ms. Raisbeck signed a "Refusal to Submit to Treatment or Procedure" form on February 13, 2023 specifically rejecting the antibiotic, Keflex – but not rejecting another antibiotic she was given called Bactrim.  Bactrim is not related to penicillin, and so Ms. Raisbeck knew she was safe to take Bactrim and was not safe to take Keflex.  LPN Rodriguez noted the refusal.

22



| 02-13-2023 3:45 pm | Refused | Refusal form completed | Rodriguez, LPN, Karina | CEPHALEXIN (KEFLEX) (KEFLEX) 500MG 1 CAP By Mouth QID ; per med ver |
|---|---|---|---|---|

79. When Ms. Raisbeck was at JCDF in July 2023, she was given a topical antibiotic for skin problems by LPN Caroline Ryan after a skin assessment by RN Myrla Brock, who likely realized there was an allergy to penicillin from the February 2023 refusal.

| 2311364 | Telephone/Verbal Orders- MD - PO-1.1 | Orders Received: | DYNA-HEX 4% 1 LIQ Topically QD ; antibiotic skin wash-rinse thoroughly x 14 days | Ryan LPN, Caroline | 07-02-2023 12:57 pm |
|---|---|---|---|---|---|

| 2311364 | Initial Health Assessment - HA-3.0 | Skin: | Rash/Sores (Multiple meth wounds to face and bilateral upper and lower extremities,) | Brock, RN, Myrla | 07-13-2023 12:16 pm |
|---|---|---|---|---|---|

80. Ms. Jarrell ignored the February 2023 patient Refusal (as well as the medical record listing allergies to penicillin) when she again ordered Keflex in December 2023. This meant Ms. Raisbeck received 7 total doses (7000 mg) of Keflex over a 3 day period.

**Medications**

| Medication Name (Brand Name) | CEPHALEXIN (KEFLEX) (KEFLEX) |
|---|---|
| Dosing Frequency | QID |
| Doctor's Instructions | 1 CAP By Mouth QID ; per med ver |
| Order Date | 02-11-2023 |
| Dosing Begin Date | 02-11-2023 |
| Dosing End Date | 02-21-2023 |
| Medication Expiration Date | [blank] |
| Pharmacy Drug Code | [blank] |
| Dose Strength | 500MG |
| Number of Doses | 40 |
| Generic Substitutions Permitted? | 1 |
| Patient Specific/Stock Medication | [blank] |
| Keep on Person/Staff | 1 |

| Distributed | |
|---|---|
| Current Status | Discontinued |
| Number of Refills | [blank] |
| Recorded By | Rowe, RN, Catherine L |
| Prescriber Name | Nurse Pr Jarrell, NP, Monica L |
| Patient Allergies | PCN Vicodin Codeine |
| Original Number of Refills | [blank] |
| Note to Pharmacy | [blank] |
| System Notes | Ordered by Catherine L Rowe, RN on 02-11-2023 at 7:25 am as PO20 Cancelled by System, CorEMR on 02/14/2023 0000, Reason: "Inmate was released 02-14-2023", Status automatically changed to Discontinued by System on behalf of CorEMR System on 02-14-2023 at 12:00 am, Denied by System, CorEMR on 02/14/2023 0000. Reason: Disapproved by CorEMR System on 02-14-2023 at 12:00 am because Status was changed to an inactive state by CorEMR System and Approval was still pending. |
| Sent Order to Pharmacy on Date | 02-11-2023 |
| Pharmacy Confirmed Receipt? | Unconfirmed |
| Number of Doses Offered | 10 |
| Number of Doses Received | 7 |
| Number of Doses Refused/Absent | 3 |
| Percent of Doses Received | 70 |

81. Strangely, there are no notes that show Jarrell made her own assessment of Ms. Raisbeck or why she was ordering oral antibiotics at all.

82. Ms. Jarrell should have known to avoid a medication that could cross-react when other equally effective medications existed that did not carry the same risk.[5]  Notably, Jarrell's order states the PCN (penicillin allergy, hives/rash) right on the order.  This was medical malpractice, and it is certain that the first misapplication in February compounded the problem in December by making Ms. Raisbeck mor susceptible to an extreme reaction.

---

[5] In February, Ms. Raisbeck was prescribed Bactrim – an antibiotic that did not carry the same risk for Ms. Raisbeck as a synthetic antibiotic.  Also in February, Ms. Raisbeck signed the refusal form with respect to cephalexin (Keflex) – obviously informing staff she was allergic to penicillin.  In July, RN Brock ordered a topical antibiotic instead of a pill form – avoiding the penicillin allergy altogether.

83. Despite assessing and treating Ms. Raisbeck numerous times in 2023, VitalCore's medical staff failed to recognize when her health status deviated from known symptoms of withdrawal, progressing instead to observable symptoms of severe dehydration and anaphylaxis.

84. Ms. Raisbeck received her first 1000 mg dose of cephalexin on December 13, 2023 at 12:07pm. She continued to receive twice daily dosing of 1000 mg per dose throughout the in-custody stay. Traditionally, cephalexin is dosed as 500mg every 6 hours to balance effective blood levels with medication clearance from the body. Twice daily dosing was ordered more for the convenience of staff than for patient care and treatment success

85. LPN Casey Castaneda gave Ms. Raisbeck her second dose of cephalexin 1000mg at 9:30 pm that same day. She withheld Ms. Raisbeck's diazepam dose due to a drop in blood pressure. Low blood pressure is not an expected symptom of withdrawal and is listed in the protocol as a red flag requiring immediate healthcare professional ("HCP") notification (i.e. a physician must be notified). Nurse Castaneda failed to notify anyone.

| 2322910 | COWS - WD-3.0 | Resting Pulse Rate: Measure after patient is setting or laying for one minute. | 4 - Pulse rate >120 | Castaneda, LPN, Casey | 12-14-2023 11:22 pm |
|---|---|---|---|---|---|

86. On December 15, 2023 at 10:11 am, LPN Carrie Earle gave Ms. Raisbeck her fifth 1000 mg dose of cephalexin and reported level 2 nausea, vomiting, and chills. She documented a pulse greater than 120, which also requires immediate HCP notification per protocol. No such notification occurred. In addition, she withheld a second diazepam dose "due to blood pressure and lethargy" (eMAR notation 12/15/2023 at 16:18).

| 2322910 | COWS - WD-3.0 | Resting Pulse Rate: Measure after patient is setting or laying for one minute. | 4 - Pulse rate >120 | Earle, LPN, Carrie | 12-15-2023 10:42 am |
|---|---|---|---|---|---|

87.  During the next assessment performed by LPN Nicole Mayoros at 15:17 on 12/15/23, she noted level 3 nausea, vomiting, and loose stool and "GI Upset over last ½ hour". Ms. Raisbeck received her sixth 1000 mg dose of cephalexin 6 hours later at 23:31 and LPN Mayoros withheld diazepam for a third time due to "low blood pressure".  No HCP was notified as required by protocol

88. Deputies observed Ashley experiencing severe muscle cramping and carpopedal spasm, described by Ashley as her "thumb stuck"—a neurological red flag consistent with electrolyte imbalance, dehydration, hypocalcemia, or shock. This was dismissed by an LPN who told her it was "probably low potassium" and instructed her to "drink water," despite Ashley being unable to keep fluids down for days.

89. On 12/16/2023 at 2:41am, LPN Rebecca Strong upgraded Ms. Raisbeck's nausea and vomiting to level 4 – intermittent nausea with dry heaves.

90. To summarize, Ms. Raisbeck was experiencing:

- Repeated vomiting, including black-tinged vomitus
- Inability to tolerate fluids
- Severe abdominal distress
- Rapid physiological decline
- Episodes of hypotension in conjunction with a pulse >120bpm
- Altered mental status

91. These symptoms are textbook signs of a β-lactam anaphylactic reaction and required:

- Immediate discontinuation of Keflex.
- STAT provider evaluation
- Epinephrine

- EMS transport –

None of which occurred.

## E. Ms. Raisbeck's Collapse and LPN Baer's Failure to Engage EMS

92. On December 16, 2023 at 10:17 AM, LPN Shanda Baer and Deputy Gonzales went into Ms. Raisbeck's cell because she was "lethargic and unresponsive". Baer noted a concerning change in mental status characterized as "1/cannot do serial additions or uncertain about date".

93. Ms. Raisbeck's blood pressure had dropped precipitously to a level known to be incompatible with life, and Baer could not hear a pulse. **Despite clear signs of medical collapse and the absence of a blood pressure reading, no one called 911.** The medical unit and charge nurse were either not notified, or did not respond. No documentation was placed in Ms. Raisbeck's medical chart to ensure that escalation of care occurred during rounds. Instead, LPN Shanda Baer left Ms. Raisbeck alone and untreated. She admitted to detectives during the CIRT investigation that although she realized Ms. Raisbeck was severely dehydrated and needed IV fluids, she chose to walk away and continue with her rounds for nearly an hour, seeing the 3 remaining inmates on her list while she left Ms. Raisbeck suffering final stages of anaphylactic shock. And to add insult to injury – Bear administered a seventh and fatal dose of cephalexin before returning to her detox rounds. This delay of EMS care was catastrophic.

| | |
|---|---|
| **Date of Reading** | 12-16-2023 10:17 am |
| **Date Entered** | 12-16-2023 12:32 pm |
| **Blood Pressure Sitting** | 0/0 |
| **Blood Pressure Standing** | *[blank]* |
| **Pulse Sitting** | *[blank]* |

| | |
|---|---|
| **Pulse Standing** | 67 |
| **Respiration** | 14 |
| **Temperature** | 97.7 |
| **Weight** | *[blank]* |
| **SPO2** | *[blank]* |
| **Notes** | Unable to obtain blood pressure. Notified charge nurse. |

94. Defendant Baer, who admits to having a 2-year employment history with VitalCore
Health Strategies and should have been annually trained, acted outside the monitoring
provisions of both the CIWA and COWS protocols which detail the symptoms requiring
immediate escalation of care:

> "7. Notify HCP immediately of any of the following: a. Vomiting uncontrolled or
> blood in vomit b. Signs of dehydration (low BP, Orthostatic changes, dry mucous
> membranes, decreased output, Urine SG > 1.025) c. Severe abdominal pain, no
> bowel sounds, rebound tenderness d. Blood in or black stools e. Respiratory
> Difficulty f. Pulse rate over 120. G. Chest pain h. Unconscious or changes in
> mental status i. Seizure j. Violent Behavior" [sic]

95. LPN Baer finally returned to Ms. Raisbeck at approximately 11:17 AM.  She and Deputy
Hudson had a wheelchair that they took into the cell.  Ms. Raisbeck required physical

shaking to respond.  She briefly opened her eyes, asked for water, and collapsed into a
wheelchair - then losing consciousness within a couple of minutes.  During the ride
downstairs, Ms. Raisbeck's head had to be held up by a deputy.  Deputies reported her
feet were dragging, her head fell back, and her eyes had a blank, glazed stare.

96. LPN Baer improperly administered Narcan twice on the way to the medical unit, despite
no clinical indication or symptoms of opioid overdose. This misuse delayed meaningful
medical intervention, and misled EMS providers.

97. Misdiagnosing medical emergencies as drug intoxication constitutes deliberate
indifference. *Kellum v. Mares*, 657 F. App'x 763 (10th Cir. 2016); *Burke v. Regalado*, 935
F.3d 960 (10th Cir. 2019).

98. When Ms. Raisbeck was brought to the jail medical unit, the change nurse realized that
she was experiencing a medical crisis and again administered Narcan. Jail staff still
treated Ms. Raisbeck as "overdosing" and administered three repeated doses of Narcan,
despite:

• No signs of opioid toxicity
• No respiratory depression pattern
• No pinpoint pupils
• Lab results later showing no lethal opioid concentration

99. The 911 call to EMS demonstrated that staff felt no sense of urgency.  The caller joked
that it was probably a fentanyl overdose, as "we get a lot of those here".  She chuckled.

100.      Paramedics arrived at approximately 11:34 AM. Paramedics found that Ms.
Raisbeck was in PEA (pulseless electrical activity) - cardiac arrest, with approximately
1,500 mL of black-brown gastric contents in her airway and stomach, severe dehydration,

and no respirations or gag reflex. She was transported to St. Anthony Hospital at 11:48 AM and pronounced dead by 12:07 PM.

101.    Ms. Raisbeck was transported to St. Anthony Hospital at 11:48 AM where they could find no pulse, blood pressure, or pulse oxygen level (PEA – Pulseless Electrical Activity) – and was pronounced dead by 12:07 PM.  EMS at the hospital were misinformed by the faulty jail narrative that this was a possible polysubstance overdose. Notes state, "Patient also with a large volume of black emesis.  On arrival to emergency department patient already with 30 minutes of ACLS fixed dilated blown pupils."  Too little too late.

102.    Hospital EMS considered differential diagnoses including "opiate overdose, anoxic brain injury, GI bleed, hemorrhagic shock, pulmonary embolism, electrolyte derangement, ACS".  Ms. Raisbeck never had such an analysis of her declining health at the jail.

103.    Hospital notes say, "Patient had no family present, since she was incarcerated." Ms. Raisbeck died alone.

104.    St. Anothony Hospital sent a bill to Jefferson County Jail for **$20,907.78** for the 10-minute stay.  One of the line items on that bill is "Epinephrine 0.1MG/ML syringe". The lifesaving medication that Ms. Raisbeck needed hours earlier after being poisoned by the jail staff by a contraindicated antibiotic.

105.    Defendants delayed activating EMS, failed to obtain accurate vitals, failed to i10-minutellergies, failed to identify and treat anaphylaxis with epinephrine, failed to identify a bowel obstruction, and failed to identify and treat medical collapse.  Inexcusably, the

medical staff failed to recognize severe, life-threatening dehydration which could have been identified with a simple blood test and reversed with IV fluids.

### F. LPN Baer changed and delayed the entry of medical records

106.    LPN Bear was not entering medical records in real time as Ashley Raisbeck was crashing.  She entered records at 12:26 PM and 12:34 PM - after Ms. Raisbeck had been transported by ambulance to St. Anthony's Hospital on December 16, 2025 at 11:48 AM, and after she had died at the hospital at 12:07 PM.

**Chart Notes**

| Note Date | Note Text | Note By | Note Access | Note Type |
|---|---|---|---|---|
| 12-16-2023 12:34 pm | During detox assessment patient was found in cell sleeping. Patient stated "I'm sorry I can't stand up". Helped patient move to a sitting position in patient's cell. Unable to obtain blood pressure. Patient was extremely lethargic. Pulse weak and thready, Patient instructed to take deep breaths through her nose and to exhale through her mouth. Valium held due to not being able to obtain blood pressure. Instructed patient to increase fluid intake, Patient drank full glass of Gatorade and then was helped back to her cot. Informed Cathy, charge nurse that blood pressure could not be obtained, Bringing patient down to medical to administer IV fluids. | Baer, LPN, Shanda | Medical Staff | Medical Note |
| 12-16-2023 1:46 pm | Spoke with Catlyn RN at hospital, pt arrived to ED at 1158 time of death at 1207 | Ziegelmann, RN, Esmeralda | Medical Staff | Medical Note |

| Call Date | 12-16-2023 12:26 pm |
|---|---|
| | |

| Clinician Name | Shanda N Baer, LPN |
|---|---|
| Requested by Patient? | Yes |
| Subjective | 12-16-2023 12:26 pm - Baer, LPN, Shanda : USV-- Patient brought to medical via wheelchair for I.V. fluids due to detox. Will be housed in SHU for medical observation. |
| Objective | 12-16-2023 12:26 pm - Baer, LPN, Shanda : Patient was brought to medical via wheelchair to administer I.V. fluids. Patient was verbally responsive in the module. Patient became non-verbal once in elevator and could not hold her head up upon arrival to medical. Patient was pale, cyanotic, cold, and displaying agonal breathing. First dose of Narcan administered at 1117. Ambulance called at 1118. Patient placed on non-rebreather on 15 L with oxygen saturation of 35% . Patient was then switched to ambu-bag on 15 L . Pupils dilated and fixed. Unable to obtain vital signs, Second dose of Narcan administered at 1123, Ambulance arrived on scene at 1125 . Paramedics took over treatment and were unable to obtain blood pressure. Patient then was taken by stretcher to ambulance. While in transport was unresponsive and CPR was initiated by paramedics, Ambulance left transport at 1148 . |
| Assessment | 12-16-2023 12:26 pm - Baer, LPN, Shanda : Risk for electrolyte imbalance per RN |
| Plan | 12-16-2023 12:26 pm - Baer, LPN, Shanda : Brought to medical for I.V. fluids and housing in medical observation unit. Emergency response initiated and patient sent out emergently. |
| Education | 12-16-2023 12:26 pm - Baer, LPN, Shanda : Patient sent out |
| Recorded By | Baer, LPN, Shanda |
| Notes Regarding Note Off | [blank] |

107.    LPN Baer's failure to properly enter records in real time is a red flag.  It allows

for records to be altered to fit the narrative, and calls into question all records that have

been provided.  For instance, records of vitals being taken do not include the name of the

LPNs who took them.  There are many irregularities like this in Ms. Raisbeck's medical

file.

108.    Regardless, it is clear from Ms. Baer's entries that she was UNABLE TO

OBTAIN BLOOD PRESSURE at 10:17 AM, but Ms. Raisbeck did not leave by

ambulance until 11:48 AM.

## G. Autopsy Findings Contradict Jail's Overdose Narrative

109.    The autopsy documented:

   a.  Severe dehydration
   b.  Electrolyte imbalance

    c.   Shock
    d.   Dark gastric contents consistent with black vomitus– indicating bowel obstruction
    e.   No evidence of fentanyl overdose
    f.   Intussusception

110.      These findings align with untreated anaphylaxis, shock, and organ collapse - not drug overdose.

111.      The forensic findings are incompatible with an opioid overdose and fully consistent with delayed anaphylaxis proximately caused by the application of penicillin on a patient with penicillin allergy.  It is also consistent with dehydration, which was a result of delayed medical care.

112.      It should be noted that anaphylaxis does not necessarily appear on an autopsy report, other than the appearance of edema.  Which was present.

113.      The autopsy report mentions the appearance of "black vomit" in the cell.  In fact, it notes copious amounts of black emesis[sic] (1.5 liters) – the word should be vomitus.  The ambulance report also mentions "black tinged watery vomit".  Protocol required the involvement of a physician with such a symptom, and was a strong indication of bowel obstruction.  But Defendants did not involve a physician.

CIRCUMSTANCES OF DEATH: The decedent is a 27-year-old (DOB: 07/16/1996) Caucasian female who was reportedly transferred from her single-individual cell at the Jefferson County Detention Center (JCDC) to the medical unit for evaluation for lethargy/dehydration on 12/16/2023 when she suddenly became unresponsive. There was a large volume of "black emesis" (approximately 1500 mL) noted at the scene. 911 was summoned at 1119 hours. Upon arrival of paramedics at 1130 hours, the decedent was found unresponsive with a heart rate of 48 beats per minute. The decedent was subsequently transported via ambulance to St.

bilateral NPAs placed, pt continued to be BVMd on 15lpm while moving to the ambulance. Unable to auscultate/palpate a BP. While placing pt on monitor and preparing for transport, she went apneic and had no pulse. Manual CPR was begun. Pads placed. Pt. began to have black tinged, watery vomit. Suction started w/ ttl

**H.  Jefferson County Sheriff's Office caused emotional distress to Ms. Raisbeck's family in notifying them of her death.**

114.    On December 16, 2023 at approximately 6 PM, personnel from the Jefferson County Sheriff's Office visited Plaintiff Jamie Raisbeck at her house to inform her that her daughter had died in JCDF custody that day.

115.    They had zero compassion.

116.    They stated Ashley Raisbeck had had a medical emergency and passed in transport to the hospital, and that they were going to release the information to the public.

117.    When a frantic Jamie Raisbeck asked if the JCDF would help with burial, she was told they would not do so because "no crimes had been committed".  There is not possible way that personnel could have known at that stage, on the day of Ashley Raisbeck's death, that no crimes had been committed.  And yet, they were already weaving the false narrative – demoralizing family from even seeking justice.

118.    Although Plaintiffs' counsel requested body cam footage of any contacts related to Ashley Raisbeck, none was provided with respect to this interaction.

**I. Unlawful Disclosure by County Attorney and District Attorney of Private Medical Information and False Public Statements**

119.    After Ms. Raisbeck's death, Jefferson County Attorney **Rebecca Klymkowsky** publicly released Ms. Raisbeck's Private Health Information ("PHI") to press on May 30, 2024, including:

**(a)** alleged drug-use history;

**(b)** false claims about extreme detox, (statements that were contradicted by toxicology,

autopsy, intake documentation, and deputy observations);

**(c)** alleged ingestion of fentanyl quantities not supported by any evidence in the record.

120.        These disclosures without consent violated Ms. Raisbeck's clearly established

constitutional right to medical informational privacy and state and federal confidentiality

statutes, including the Colorado Medical Records Act (CMRA) and the Health Insurance

Portability and Accountability Act (HIPAA).  Penalties for such disclosure are covered by

42 U.S.C.A. §1320d-1.  Protected Health Information is protected for 50 years.

121.        The Colorado legislature declared pursuant to C.R.S. §25-1-1201, "The general

assembly hereby finds, determines, and declares that maintaining the confidentiality of

medical records is of the utmost importance to the state and of critical importance to

patient privacy for high quality medical care.

122.        In a jail setting, medical confidentiality is even more critical.  If detainees do not

feel that they can confidentially discuss medical health history, this puts other inmates

and jail staff in jeopardy.

123.        Klymkowsky's statements about Ms. Raisbeck were knowingly false and

designed to deflect public scrutiny from Defendants' medical neglect and deliberate

indifference, and to prejudice public opinion by blaming the victim.  They were wholly

irrelevant to Ms. Raisbeck's death or her condition and violated the "minimum

necessary" rule – meaning disclosures must be limited to the least amount of PHI needed

for the purpose.  There was no purpose in releasing this information.

124.        County Attorney Rebecca Klymkowsky's supervisor is Kimberly Sorrells.  Ms.

Sorrells has the duty to adequately and properly supervise her employee, and failed to do

so.  She is vicariously liable for this disclosure under *respondeat superior* – which holds

an employer or principal legal responsible for the wrongful acts of an employee or agent, if such acts occur within the scope of the employment or agency.

125.     Plaintiffs' counsel listed the unlawful release of PHI in the potential claims in the CGIA Notice of Claim sent to County Attorney Kim Sorrells on June 11, 2024.

126.     Nevertheless, a week later on June 20, 2024 – for a second time, District Attorney Alexis King released almost identical PHI information and prejudicial statements in the body of her letter regarding the CIRT investigation.  Although King admits in the CIRT report that drugs were not a contributing factor in Ms. Raisbeck's death, she still focuses on and illegally discloses Ms. Raisbeck's alleged drug use history – violating state and federal law about PHI.

127.     All of these Jefferson County attorneys who allegedly fight for victims – themselves engaged in victimizing Ashley Raisbeck and her family, as Jamie Raisbeck was absolutely terrorized by the public disclosure of her daughter's PHI and the implication that a person suffering a disability under the ADA with regard to substance abuse disorder (SAD) deserves no justice, no oversight, and no charges to be pressed against her killers.

## J.  Missing and altered medical records

128.     Although Plaintiffs made multiple supplemental requests for medical records, the Sheriff refused to provide them.  In fact, the County Attorney refused to provide the arresting agency's body cam footage, police report, and other records – even though that should have been part of the CIRT file.  When the records were requested directly from Wheat Ridge PD, they stated that the court case had been sealed and they denied the request.

129.     Upon subsequent review, the last case the District Attorney filed against Ashley

Raisbeck (23M6755) had been inexplicably sealed after her death.  This was what Wheat

Ridge used to deny the production of arresting information from December 12, 2023.[6]

130.     Many other records, such as intake video, have not been provided although a

written preservation request was made, the CIRT team should have collected and

preserved all relevant records, and it is obvious this would be relevant to litigation in a

wrongful death scenario.

131.     Inexplicably, some of the jail medical records jump from the intake with

Castaneda on December 13, 2023 to December 16, 2023 at 11:25 AM – the time JCDF

was finally calling for an ambulance because Ms. Raisbeck was unresponsive and her

pupils were blown.  Many issues like this indicate that jail medical records have been

withheld or altered.

132.     Critical records that are missing, incomplete, or never created, include:

**(a)** MARs;

**(b)** detox logs;

**(c)** vital-sign records;

**(d)** nursing notes;

**(e)** housing logs;

**(f)** pod video surveillance.

133.     The absence of routine required records is evidence of **spoliation**, deliberate

indifference, and unconstitutional policy failures.

---

[6] It should be noted that the same thing has occurred in the case involving the death of Courtney Tinker, who died on March 29, 2024 – a few months after Ashley Raisbeck.  The County Attorney is denying records based on her case being sealed after her death.

**K. CIRT Irregularities and Evidence of a Possible Jefferson County Cover Up**

134.      As is customary, District Attorney Alexis King mobilized the Critical Incident Response Team ("CIRT") to investigate the death of Ashley Raisbeck.  Per protocol, a police agency other than the arresting agency investigates – so Lakewood Police investigated and interviewed witnesses.

135.      Commander McNitt was in charge.  Upon information and belief, Commander McNitt is a police employee without a Medical Degree, and therefore was not qualified to investigate this death.

136.      Upon information and belief, officials and staff engaged in a coordinated effort to conceal wrongdoing, including withholding critical medical records, failing to preserve video, altering timelines and medical records, omitting key facts in the CIRT report, and publicly releasing false and private medical information to shift blame onto the deceased – knowing it to be false that Ms. Raisbeck's death was the result of an overdose or due to withdrawal.

137.      Nowhere does the CIRT report mention that a nurse and a deputy walked away from a patient who had no blood pressure or pulse (an emergent situation) for an hour to finish their rounds – though these witnesses admitted this to the investigators.

138.      Nowhere in the CIRT report does it mention that Monica Jarrell overdosed Ms. Raisbeck on an antibiotic that she was allergic to.

139.      The CIRT investigation:

**(a)** omitted key facts;

**(b)** failed to question medical staff about cephalexin, avoiding substantive discussion about the antibiotic administration or the name of the antibiotic that was given;

**(c)** pressured deputies to connect Ms. Raisbeck's collapse to unrelated fentanyl found in

another unit that Ms. Raisbeck had no contact with;

**(d)** ignored neurological symptoms;

**(e)** failed to document skipped detox checks;

**(f)** accepted medically implausible explanations without scrutiny;

**(g)** led the witnesses;

**(h)** failed to identify medical malpractice, medical negligence, and deliberate indifference to medical needs by both deputies, and medical staff.

131.  Although LPN Shanda Baer ADMITTED to walking away from a patient with no blood pressure reading or pulse for an hour to "finish her rounds" – the CIRT team found no fault with this.

132. These omissions and deflections show CIRT acted to protect the Defendants, not investigate Ms. Raisbeck's death.

133.  District Attorney Alexis King's CIRT letter from June 20, 2024 failed to protect a victim – and instead included irrelevant PHI information meant to villainize and blame the victim.

134.  Notably, Ms. King's report highlights the medical negligence by stating, "**They could not obtain blood pressure** with Ms. Raisbeck's weak and thready pulse" at 10:10 AM, and admitting she was not taken to the medical until at least 11:10 AM.  That fact alone supports the case for deliberate indifference - and perhaps criminally negligent homicide (as paramedics in the Elijah McClain ketamine death were charged with).  And yet District Attorney Alexis King did nothing, held no one accountable, filed no charges.

135.  The CIRT concludes, "Given the facts set forth by Commander McNitt, and upon review by my office, Ms. Raisbeck's death was not caused by any criminal actions taken by **law enforcement**."  No mention is made of criminal actions by other actors.

136.  The CIRT investigation and report is discriminatory toward Ms. Raisbeck as someone protected under the American Disabilities Act  ("ADA") for a substance abuse disorder that she could not help – which incidentally had nothing to do with her death by the District Attorney's own admission.

137.  Upon information and belief, the District Attorney's Office later filed a motion to seal the Wheat Ridge arrest case.  That has prevented Plaintiffs from obtaining information from the arresting agency, which should have been part of the CIRT file in the first place.  Wheat Ridge Police Department responded that "No files exist", when the Raisbeck arrest records were requested.  Upon information and belief, critical information is being deliberately concealed by multiple government agencies in this matter.

138.  Upon information and belief, these acts of concealment, suppression of records, misrepresentations to the public, and failures to preserve critical evidence were designed to conspire to protect the state and its agents from accountability for Ms. Raisbeck's in-custody death.  They are designed to cover up a homicide.

**L.  Systemic Customs and Practices Causing Ashley's Death**

139.  Jefferson County and VitalCore maintained longstanding customs including:

**(a)** misclassifying medical crises as detox;

**(b)** chronic understaffing;

**(c)** provider inaccessibility;

41

**(d)** reliance on LPN-only coverage;

**(e)** delayed EMS activation;

**(f)** inadequate training of deputies;

**(g)** failure to supervise medication administration;

**(h)** routine documentation failures;

**(i)** suppression of records after critical incidents.

140.  These customs created a foreseeable and substantial risk of serious harm to detainees.

**M. Foreseeability, Preventability, and Loss of Chance**

141.  Had Ms. Raisbeck received:

**(a)** timely EMS activation;

**(b)** IV fluids;

**(c)** labs or vitals;

**(d)** cessation of contraindicated antibiotic;

**(e)** physician evaluation;

**(f)** treatment for dehydration or shock

(g) epinephrine instead of Narcan;

…she more likely than not would have survived.

142.  Under Colorado's **loss-of-chance** doctrine, Defendants' delays and actions substantially

reduced Ashley's chance of survival.

**N.  Summary of Defendants' Conduct**

143.  Defendants' acts and omissions—individually and collectively—constituted deliberate indifference, negligence, wrongful death, discrimination, violation of privacy, spoliation, and constitutional injury.

144.  These failures directly and proximately caused Ashley's suffering, physiological collapse, cardiac arrest, and death.

**O.  VitalCore's Licensed Practical Nurses (LPNs) regularly practice medicine outside their scope and fail to follow protocol at JCDF – Violating American Correctional Association ("ACA") Accreditation Standards**

145. Despite observing the increasingly serious signs that Ms. Raisbeck's condition was precipitously declining – including low or no blood pressure, faint/weak/thready pulse or pulse over 120, lethargy, obvious dehydration, and black vomit – Defendant LPN nurses failed to provide adequate medical treatment or to escalate Ms. Raisbeck's situation to the appropriate medical providers for days.  This denial of proper medical care is a regular occurrence at JCDF.

146. There are several examples of Shanda Baer practicing medicine outside her scope/training/experience/competency with Ms. Raisbeck.  She conducted provider-level assessments, made a clinical diagnosis when she withheld diazepam and when she ignored the lack of vital signs, made diagnostic decisions regarding "withdrawal," decided Ms. Raisbeck was "overdosing," initiated and withheld medications, performed detox evaluations, and failed to effectively escalate critical symptoms to an RN or a medical professional licensed to diagnose. These acts were outside the scope of LPN licensure and violated Colorado nursing law.

43

147. In addition, the "Withdrawal From Alcohol Nursing Clinical Guideline – 2300" appears

right in the CIWA (Clinical Institute Withdrawal Assessment) and COWS (Clinical

Opiate Withdrawal Scale) documentation in Ashley Raisbeck's medical records – but did

not lead the LPNs to administer proper care:

| 2302652 | Withdrawal From Alcohol Nursing Clinical Guideline - 2300 | Plan 1. Inform HCP if patient has any of the following: a, Pregnancy b, Unstable Psychiatric History c, Chronic Medical Condition d, History of DT's or withdrawal seizures 2. Relate offender assessment and score of the Clinical Institute Withdrawal Assessment for Alcohol scale. 3. Assessment Protocol when the offender is monitored on site: a, Vitals, assess Now, Notify HCP if score is ≥ 8 for medication orders, b, Monitor ANYONE going through withdrawal for 7 days. c, If the initial score is ≥ 8 then repeat assessment every 4hrs X 24hrs, then if stable and score remains ≥ 8 assess every 6hrs for the remaining 7-day period unless the score drops below 8 then follow directions below in d below. d, If the initial score is < 8, assess every 6hrs x 48hrs, if stable and score remains < 8 assess every shift for 7 days. e, If the score increases to ≥ 8 at any time during the 7-day assessment period, follow assessment directions in c above, f, If indicated, (see indications below) administer PRN medications as ordered and record on MAR and on CIWA-Ar form, 4. Clear Liquid diet initially then advance to regular as tolerated 5. Contact MH and complete a referral. 6. Encourage fluids. 7. Notify HCP immediately of any of the following: a, Vomiting uncontrolled or blood in vomit b, Signs of dehydration (low BP, Orthostatic changes, dry mucous membranes, decreased output, Urine SG > 1.025) c, Severe abdominal pain, no bowel sounds, rebound tenderness, d, Blood in or black stools e, Respiratory Difficulty f, Pulse rate over 120. g, Chest pain h, Unconsciousness or change in mental status i, Seizure j, Violent Behavior | Encourage fluids | Rowe, RN, Catherine L | 02-11-2023 9:14 am |
|---|---|---|---|---|---|

148. From the initial intake, the LPN's were acting outside their scope.  Ms. Raisbeck was

cleared for general population at 10:30 AM by LPN Casey Castaneda and a jail

counselor—not by a physician, Nurse Practitioner, Physician's Assistant, or Registered

Nurse.  This is a clinical assessment that an LPN should not be making due to a lack of

education and training.

149. During CIWA and COWS protocol monitoring, the assessing nurses - LPNs acting

outside their scope – measured Ms. Raisbeck's pulse to be greater than 120 at least twice

- on 12/14/2023 at 11:22 am and on 12/15/2023 at 10:42 am.  Yet the LPN's failed to

notify a physician or Health Car Provider ("HCP") to be in compliance with their own

protocols.

| 2322910 | COWS - WD-3.0 | Resting Pulse Rate: Measure after patient is setting or laying for one minute. | 4 - Pulse rate >120 | Earle, LPN, Carrie | 12-15-2023 10:42 am |
|---|---|---|---|---|---|

| 2322910 | COWS - WD-3.0 | Resting Pulse Rate: Measure after patient is setting or laying for one minute. | 4 - Pulse rate >120 | Castaneda, LPN, Casey | 12-14-2023 11:22 pm |
|---|---|---|---|---|---|

150. LPN Strong reported increased vomiting over the next 2 days, culminating in an assessment of "4/intermittent nausea w/dry heaves" plus a "4/very much so" assessment for loss of appetite at 2:42 AM on 12/16/23.  LPN Mayoros noted "nausea or loose stool" and "GI Upset over last ½ hour".

151. Ms. Raisbeck's declining health status is reflected in the orders to "hold" her diazepam medication, a palliative therapy for alcohol and opiate withdrawal. The diazepam dose was held on 12/13/2025 at 21:54 by LPN Castaneda, 12/15/2023 at 16:18 by LPN Mayoros, and 12/15/2023 at 23:37 by LPN Strong.  The responsible nurses – LPNs functioning outside the scope of their licensure and outside the requirements of protocol - documented that the medication was held due to low **blood pressure and "lethargy"** (12/15/2023 at 16:18).  The violations by these LPNs, which include making clinical assessments that may only be done by a physician and failing to report to a HCP, are so extreme and constant that it puts the accreditation of JCDF in jeopardy.

| 12-15-2023 11:37 pm | Other | Held due to bp | Strong, LPN, Rebecca A. | DIAZEPAM (VALIUM) (VALIUM) 5MG 3 TAB By Mouth Detox TID |
| 12-16-2023 10:17 am | Received | [blank] | Baer, LPN, Shanda | ACETAMINOPHEN (TYLENOL) (TYLENOL) 325MG 2 TAB By Mouth Detox BID PRN; DO NOT USE WITH IBUPROFEN |
| 12-16-2023 10:17 am | Received | [blank] | Baer, LPN, Shanda | MECLIZINE CHEW (ANTIVERT) 25MG 1 TAB By Mouth Detox BID PRN |
| 12-16-2023 10:17 am | Received | [blank] | Baer, LPN, Shanda | CIWA-B MONITORING () 0 1 0 Other/Miscellaneous Detox TID |
| 12-16-2023 10:17 am | Received | [blank] | Baer, LPN, Shanda | CIWA-Ar MONITORING () 0 1 0 Other/Miscellaneous Detox TID |
| 12-16-2023 10:17 am | Other | Medication held d/ low blood pressure | Baer, LPN, Shanda | DIAZEPAM (VALIUM) (VALIUM) 10MG 1 TAB By Mouth Detox TID |
| 12-16-2023 10:17 am | Received | [blank] | Baer, LPN, Shanda | COWS MONITORING () 0 1 0 Other/Miscellaneous Detox TID |
| 12-16-2023 10:17 am | Received | [blank] | Baer, LPN, Shanda | ELECTROLYTE REPLACEMENT THERAPY () 0 1 Mix By Mouth Detox TID |
| 12-16-2023 10:41 am | Received | [blank] | Baer, LPN, Shanda | CEPHALEXIN (KEFLEX) (KEFLEX) 500MG 2 CAP By Mouth BID |

| 12-15-2023 4:18 pm | Other | Not given due to bp andlethargy | Mayoros, LPN, Nicole M. | DIAZEPAM (VALIUM) (VALIUM) 5MG 3 TAB By Mouth Detox TID |

152.     Diazepam, and all medications in the benzodiazepine class, cause the lowering of blood pressure by acting on blood vessels, resulting in a reduction in sympathetic muscle tone. The ability to interpret drug-condition interactions and change medication orders are not traditionally the duty or responsibility of licensed practical nurses or registered nurses in the state of Colorado.  The truth is that the LPNs at JCDF had no idea why Ms. Raisbeck's blood pressure was dropping.  The assumption that it was related to diazepam was not a decision they were qualified to make.

153.Multiple LPNs—Shanda N. Baer (LPN), Rebecca A. Strong (LPN), Casey Castaneda (LPN), Nicole M. Mayoros (LPN), and others—performed provider-level assessments that they are not licensed to perform, including:

- Diagnosing "withdrawal"

- Diagnosing "overdose"

- Making medical clearance decisions

- Holding diazepam

- Rating detox scales

- Determining treatment plans

- Attempting to interpret collapsing vital signs

- Determining no medical emergency when vital signs were absent

- Attempting to diagnose the cause of dehydration

- Ignoring severe dehydration

- Delay in treatment

- Deciding whether or not EMS was required

154. When Ms. Raisbeck's condition worsened, Shanda Baer, the LPN on duty:

- Declared Ms. Raisbeck was "overdosing" (when she was actually overdosing on the antibiotics NP Jarrell prescribed, and not opiates)

- Administered Narcan multiple times

- Administered penicillin when there was a known allergy

- Failed to recognize anaphylaxis

- Failed to check for airway involvement

- Failed to notify an RN or provider

- Failed to activate EMS immediately

- Failed to discontinue the antibiotic

- Failed to treat hypotension

- Failed to understand the gravity of having no blood pressure reading

- Failed to treat shock

- Failed to treat severe dehydration

- Stated that she went to "finish her rounds" for an hour after obtaining no blood pressure reading.

- Failed to call 911

155. Initiating antibiotic therapy without physician evaluation violates NCCHC standards J-E-12, requiring provider review for all new antibiotic orders in correctional settings – which involved Monica Jarrell acting outside the scope of her training.

156. Defendants Jefferson County and VitalCore violated their accreditation with the American Correctional Association, as well as the following performance-based standards:

   a. **5-ALDF-4D-01**: Health Authority – responsible for identifying the type of health care providers needed to provide the determined scope of services and establishing systems for the coordination of care among multidisciplinary health care providers. "When the health authority is other than a PHYSICIAN, final clinical judgements rest with a single, designated, responsible PHYSICIAN."

   b. **5-ALDF-4D-08**: Emergency Response: "Correctional and health care personnel are trained to respond to health-related situations within a **four-minute response** time. The training program is conducted on an annual basis and is established by the responsible authority in cooperation with the facility or program administrator and includes instruction on: Recognition of signs and symptoms, and knowledge of action that is required in potential emergency situations…[and] procedures for patient transfers to appropriate medical facilities or health care providers."

157. ACA Accreditation is performance based rather than evidence based  – meaning protocols are put in place that must be followed.  But when a situation does not fall squarely within the four corners of a protocol, staff MUST seek help from a physician. That is what fails to occur time and time again at JCDF.  There are countless examples of

failure to follow protocol with respect to Ms. Raisbeck's care alone – and this should cause JCDF to lose its accreditation.

158. These scope-of-practice violations contravene Colorado Department of Regulatory Agencies (DORA) Nursing Board Rule 1.13, which prohibits LPNs from independent assessment, diagnosis, or triage of emergent medical conditions.

159. National EMS response standards (NEMSAC 2020) require immediate activation for signs of anaphylaxis and hypotensive collapse. Defendants violated universally recognized emergency-medicine protocols by delaying the call.

160. Additionally, they unquestionably violated ACA Standards.

## P. VitalCore's Pattern and Practice

161. VitalCore maintains a policy, pattern and practice of allowing Licensed Practical Nurses to conduct medical examinations and make diagnostic decisions reserved for Physicians, Nurse Practitioners, and Physician's Assistants.  Plaintiff's investigation has uncovered similar incidents involving VitalCore and LPNs acting outside their scope or in violation of protocols – just as LPN Baer did:

162. In *Zazzali v. VitalCore Health Strategies,* 2:24-cv-1015 District Court of Vermont, (in which a VitalCore MD has sued VitalCore for forging his signature on protocols) the court recognized allegations that VitalCore routinely permitted nurses to perform provider-level assessments across multiple facilities, resulting in denial of a motion to dismiss. *Zazzali* uncovered a pattern and practice of nurses performing provider-level exams, system wide discrepancies, and lack of qualified providers – all in order to cut costs.   This mirrors what occurred with Ms. Raisbeck, where LPNs made diagnostic

decisions without provider oversight, directly contributing to Ms. Raisbeck's untreated anaphylaxis, dehydration, and allergy driven intussusception.

163. This policy directly caused LPNs at Jefferson County Jail to, among other things: Diagnose "withdrawal," Diagnose "overdose," Initiate medications, Clear detainees for housing, Perform detox scoring, Decide whether EMS was necessary.

164. Conducting provider-level assessments by unqualified staff reflects deliberate indifference under Tenth Circuit law. See *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) (ignoring obvious symptoms constitutes deliberate indifference); *Self v. Crum*, 439 F.3d 1227 (10th Cir. 2006) (failure to escalate serious symptoms to qualified providers supports liability).

## VI. MONELL ALLEGATIONS

*(Against Jefferson County, BOCC, JCSO, Sheriff Marinelli (official capacity), and VitalCore Health Strategies, LLC)*

165. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

166. Jefferson County and VitalCore are liable under **Monell v. Department of Social Services**, 436 U.S. 658 (1978), because Ms. Raisbeck's death was caused by **official policies, longstanding customs, systemic failures, and deliberate inaction** that created and perpetuated unconstitutional conditions of confinement and medical care at JCDF.

### A. Failure to Train Deputies and Medical Staff in Emergency Recognition and Response

167. Jefferson County failed to adequately train deputies to recognize signs of:

**(a)** dehydration crisis;

**(b)** shock;

(c) anaphylaxis;

(d) neurological compromise;

(e) gastrointestinal obstruction;

(f) life-threatening withdrawal complications;

(g) vital signs;

(h) medical emergency.

168. Deputies testified they believed Ms. Raisbeck was "detoxing," despite witnessing ongoing vomiting and diarrhea (deputies brought Ms. Raisbeck new clothes as a result), collapse, unresponsiveness, blank stares, dragging feet, cramping and inability to stand—symptoms no reasonable, trained officer would misinterpret absent inadequate training.

169. This failure to train constitutes deliberate indifference because the risk of detainees experiencing medical emergencies is obvious and recurrent. There has been a pattern and practice of this recurrent deliberate indifference in Jefferson County, where there have been repeated deaths.

## B. Unconstitutional Custom of Treating All Medical Distress as "Detox"

170. A pervasive custom exists at JCDF of labeling detainees' medical symptoms as "detox," regardless of clinical presentation.

171. This custom is so entrenched that:

(a) LPNs ignored vomiting lasting over 48 hours;

(b) deputies minimized neurological symptoms;

(c) EMS is delayed or never activated (was delayed for over an hour with Ms. Raisbeck);

(d) severe dehydration and collapse go untreated.

172. Treating all symptoms and medical crises as detox prevented meaningful assessment and caused Ms. Raisbeck's death.

## C. Chronic Understaffing and Improper LPN-Only Coverage

**173.** VitalCore maintains a profit-driven staffing model that relies primarily on LPNs to perform assessments, triage, emergency evaluations, and medical decision-making.

174. LPNs are legally prohibited from independent assessment or diagnosis, yet at JCDF they function as the only on-duty medical decision-makers during critical periods.

175. JCDF fails to staff RNs, NPs, or physicians adequately, ensuring that no qualified provider was available during Ms. Raisbeck's medical decline.

176. In Ms. Raisbeck's case, the absence of provider-level oversight was a direct cause of:

(a) failure to recognize dehydration and shock or signs of bowel obstruction;

(b) failure to obtain vitals;

(c) failure to discontinue contraindicated medication or recognize allergies;

(d) failure to activate EMS;

(e) failure to timely transfer Ms. Raisbeck to a hospital.

## D. Failure to Supervise VitalCore and Its Clinical Staff

177. In summary, Jefferson County and VitalCore maintain policies, customs, and practices—including chronic understaffing, inadequate training, reliance on LPN-only medical coverage, failure to preserve or reference medical records, misclassification of medical crises as detox, and delayed EMS activation—that, individually and collectively, create an unconstitutional risk of harm to detainees. These systemic defects are longstanding, pervasive, known to policymakers, and were the proximate cause and moving force

behind the violation of Ashley Jo Raisbeck's constitutional rights and her preventable

death.

178. Jefferson County knew or should have known that VitalCore, among other things:

    (a) understaffed the jail;

    (b) employed unqualified personnel without proper oversight;

    (c) failed to maintain or reference medical records;

    (d) failed to escalate emergencies;

    (e) violated national correctional standards.

179. Sheriff Marinelli, as final policymaker, with deliberate indifference, ratified these

practices through inaction, failure to discipline, and ongoing contract renewal despite

known failures.

## E. Failure to Preserve Medical and Surveillance Records

180. JCDF and VitalCore maintain policies or customs that result in the consistent failure to

preserve:

    (a) MARs;

    (b) detox logs;

    (c) vital-sign records;

    (d) surveillance footage (and failure to attach audio to video);

    (e) nursing progress notes;

    (f) daily housing logs.

181. These omissions are not isolated incidents but part of an unconstitutional pattern that

impede oversight, conceal misconduct, and facilitate medical neglect.

**F. Delayed EMS Activation as Standard Practice**

182. JCDF staff routinely delays EMS activation in medical emergencies, relying instead on in-house staff unqualified to manage severe illness.

183. The custom of delaying EMS resulted in Ms. Raisbeck being in cardiac arrest before emergency responders were called, even though there were signs of her medical emergency for days.

184. This delay violated national correctional medical standards and constituted deliberate indifference

185. It also cost the Jefferson County Jail a $20,907.78 bill from St. Anthony's Hospital for a 10 minute stay – after Ms. Raisbeck had already lost Pulseless Electrical Activity (PEA).

**G. Policy and Practice of Inadequate Documentation**

186. VitalCore and JCDF maintain a custom of incomplete, inaccurate, or missing documentation in detainee medical charts.

187. Missing MARs, detox logs, and vitals prevent continuity of care and conceal deterioration.

188. This documentation failure directly contributed to staff's inability to recognize Ms. Raisbeck's crisis.

**H. Ratification Through Post-Incident Misconduct and Concealment**

189. Jefferson County ratified unconstitutional practices through:

(a) CIRT's incomplete and bias investigation;

(b) attempts by CIRT investigators to pressure deputies into providing a fentanyl

narrative;

(c) public dissemination of false statements;

(d) sealing of Ms. Raisbeck's criminal case to conceal records from the arresting agency;

(e) failure to discipline (or consider charges against) responsible staff.

190. These actions reflect an official policy of minimizing liability rather than addressing systemic medical neglect and lack of training.

## I. Combined Effect of Customs, Policies, and Failures

191. The combined effect of Jefferson County and VitalCore's policies, customs, and failures create a constitutionally deficient medical system where detainees face substantial risk of death from preventable conditions.

192. These systemic failures were the proximate cause and moving force behind Ashley Jo Raisbeck's suffering, deterioration, cardiac arrest, and death.

## VII. STATEMENT OF CLAIMS FOR RELIEF

### CLAIM ONE
**Deliberate Indifference to Serious Medical Needs and Failure to Provide Adequate Medical Care and Treatment and Safe Conditions of Confinement**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**(Plaintiffs Against All Defendants)**

193. Plaintiffs hereby incorporate all prior allegations.

194. At all times relevant to this claim, each individual Defendant was acting under color of state law and within the scope of his or her official duties and employment in his/her/its actions or inactions/omissions.

195. Medical Defendants, Deputy Defendants, VitalCore, and other Jefferson County Defendants are a person under 42 USC 1983.

196. Ms. Raisbeck had a clearly established right under the 14th Amendment to the US Constitution to be free from deliberate indifference to her known serious medical needs and not be damaged medically by medical malpractice or negligence.

197. Intussusception[7], severe dehydration, lack of vital signs, and anaphylactic shock are conditions that constitute a serious medical need. Overdose due to an antibiotic that Nurse Practitioner Monica Jarrell administered to Ms. Raisbeck is a serious medical need.

198. The symptoms Ms. Raisbeck presented with demonstrated that she had a serious medical need.

199. Ms. Raisbeck presented with objectively serious medical needs, including continuous vomiting for more than 48 hours, black vomit, inability to keep fluids down, visible severe dehydration, neurological impairment (including muscle spasms and inability to stand), hypotension, collapse, dehydration, GI dysfunction, low or lack of blood pressure, no pulse, rapidly progressing anaphylaxis, allergic reaction to antibiotic, possible allergy related intussusception, and eventual unresponsiveness. These conditions carried a substantial risk of death.

200. Medical Defendants and Deputy Defendants knew of these conditions because they personally observed:

     (a) Ms. Raisbeck vomiting repeatedly into trash bags and toilets and having diarrhea (Deputy Hudson testified to providing new clothes because of this);

---

[7] Intussusception is a serious condition in which part of the intestine slides into another part, much like a telescope. This telescoping action often blocks food or fluid from passing through. Intussusception also cuts off the blood supply to the part of the intestine that's affected. This can lead to infection, death of bowel tissue or a tear in the bowel, called perforation. However, upon information and belief, Ms. Raisbeck's bowel obstruction was likely related to the antibiotic she was administered and the allergic reaction she was experiencing.

(b) Ms. Raisbeck unable to stand without assistance, dragging her feet, and holding her head up with difficulty;

(c) Ms. Raisbeck requesting water and reporting inability to hydrate, and not able to take her liquid diet;

(d) Ms. Raisbeck reporting neurological symptoms including "thumb stuck" and muscle cramps;

(e) Ms. Raisbeck unresponsive in her cell or unable to stand up or come out;

(f) The inability to obtain a blood pressure reading or pulse, indicating shock;

(g) The appearance of a rash and hives all over Ms. Raisbeck, indicating an allergic reaction (which LPN Baer admitted was not a normal skin problem in a detox situation);

(h) Such lethargy and low blood pressure that diazepam was repeatedly held.

201. Given that even lay persons (the deputies) recognized Ms. Raisbeck's dire condition (Deputy Gonzales was aware of the lack of blood pressure and pulse), each medical Defendant should have also recognized the dire condition and need for medical treatment. In fact, LPN Baer did recognize this on December 16, 2023 when she determined Ms. Raisbeck needed to be taken down to the medical unit and given IV fluids. But even then – she did not act for an hour.

202. Deputy Defendants Hudson, Gonzales, Scott, Whiting and Borus knew, or should have known, that Ms. Raisbeck was in a medical crisis but did not act or call for EMS.

203. Sheriff Marinelli, who has been sued repeatedly for similar incidents to Ms. Raisbeck's and is fully notified regarding JCDF's failure to provide adequate medical care to its detainees, is deliberately indifferent resulting in regular deaths in the facility.

204. Despite this actual knowledge, Defendants failed with deliberate indifference to provide her constitutional right to necessary medical care, putting Ms. Raisbeck at substantial risk of serious physical harm, including but not limited to:

(a) failing to check or report concerning vital signs;

(b) failing to escalate to an RN, NP, or physician;

(c) failing to timely send Ms. Raisbeck to the medical unit despite clear deterioration;

(d) failing to timely activate EMS until an hour after the emergent situation (no vital signs);

(e) mislabeling symptoms as "detox" despite contradictory evidence;

(f) failing to document or monitor Ms. Raisbeck's condition;

(g) leaving Ms. Raisbeck in her cell alone, despite medical crisis;

(h) failing to recognize medical allergies or the overdose of the Keflex antibiotic – and failure to monitor a patient as required by the FDA Black Box warning.

205. This conduct constitutes deliberate indifference under *Estelle v. Gamble, Farmer v. Brennan, Mata v. Saiz*, and *Sealock v. Colorado,* where Defendants consciously disregarded a known, substantial risk of serious harm.

206. The actions and omissions of each Defendant were the legal and proximate cause of Ms. Raisbeck's injuries and death.

207. Defendants' deliberate indifference to Ms. Raisbeck's constitutional right to necessary medical care legally and proximately caused Ms. Raisbeck damages in the form of extreme pain, prolonged suffering, physiological collapse, cardiac arrest, and death.

208. Defendants, through their actions and omissions as described herein, intentionally deprived Ms. Raisbeck of her right to be free of cruel and unusual punishment and of rights, privileges, liberties and immunities secured by the Constitution of the United States, and proximately caused Plaintiffs injuries, damages, and losses.

## CLAIM TWO
### Medical Negligence Causing Wrongful Death
### (Plaintiffs Against VitalCore and Medical Defendants)

209. Plaintiffs incorporate all preceding paragraphs.

210. VitalCore is a private company that contracts to provide medical care and health services to inmates at JCDF, and is not entitled to any immunity under CGIA.

211. Defendants Baer, Strong, Mayoros, Ryan, Castaneda, Earle, Ziegelmann, Rowe, and Jarrell, are private individuals and not public officials or employees and are not entitled to any immunity under CGIA.

212. At all times relevant to this action, Ms. Raisbeck was under the medical responsibility, care, and treatment of Defendants Baer, Strong, Mayoros, Ryan, Castaneda, Earle, Ziegelmann, Rowe, and Jarrell.

213. VitalCore and Jefferson County Defendants (including Sheriff Marinelli) are vicariously liable for the negligent acts and omissions by their agents and/or employees, including but not limited to those named individually herein, and those directly liable for negligent failures in training, polices, and practices. They are therefore liable for all of the actions and omissions of the Medical Defendants as described herein.

214. Defendants Baer, Strong, Mayoros, Ryan, Castaneda, Earle, Ziegelmann, Rowe, and Jarrell had a duty to provide reasonable medical care and treatment to inmates at the JCDF, including to Ms. Raisbeck, and to exercise reasonable are in the training and supervision of their employees.

215. These duties of care are informed by state law. Under CRS 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and if

required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

216. Through their actions and omissions, Defendants Baer, Strong, Mayoros, Ryan, Castaneda, Earle, Ziegelmann, Rowe, and Jarrell breached their duty of care and were negligent when they failed to adequately assess, monitor, treat and care for Ms. Raisbeck.

217. Defendants Baer, Strong, Mayoros, Ryan, Castaneda, Earle, Ziegelmann, Rowe, and Jarrell had nurse-patient relationships with Ms. Raisbeck at all relevant times and were acting within the scope of their employment while treating Ms. Raisbeck.

218. With respect to their care and treatment of Ms. Raisbeck, Defendants Baer, Strong, Mayoros, Ryan, Castaneda, Earle, Ziegelmann, Rowe, and Jarrell owed her a duty to exercise that degree of care, skill, caution, diligence and foresight exercised and expected of medical personnel in similar situations. Defendants Baer, Strong, Mayoros, Ryan, Castaneda, Earle, Ziegelmann, Rowe deviated from that standard of care and were negligent in failing to properly assess, monitor, treat and care for Ms. Raisbeck.

219. Defendants' conduct was done out of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, reckless, and without regard to consequences to Plaintiffs.

220. Defendants failed to use the care, skill, and learning expected of reasonably prudent correctional medical personnel, including but not limited to:

- Administering a contraindicated antibiotic called cephalexin despite documented allergy to penicillin (effectively overdosing the patient on Keflex);
- Ignoring MAR allergy alerts;
- Allowing LPNs to perform provider-level assessments;
- Treating anaphylaxis as drug overdose;

- Failing to provide epinephrine;
- Failing to treat shock;
- Failing to obtain vitals or address dehydration;
- Failing to timely call EMS when blood pressure was absent;
- Failing to supervise unqualified staff or escalate to an NP, RN, or physician per protocol.

221. These acts constitute gross negligence—a reckless disregard for known medical risks.

*Forman v. Brown,* 944 P.2d 559 (Colo. App. 1996).

222. Custodial entities are liable for negligent medical care provided to detainees. *Estate of Lobato v. ICAO*, 201 P.3d 1148 (Colo. App. 2008). Jefferson County and the Sheriff are therefore liable for what happened to Ms. Raisbeck.

223. Defendants Baer, Strong, Mayoros, Ryan, Castaneda, Earle, Ziegelmann, Rowe, and Jarrell breached their duty to provide reasonable medical care and treatment, which directly and proximately caused her to suffer significant physical and mental pain and suffering, injuries, and losses in the final days of her life – in addition to her death.

224. Defendants Baer, Strong, Mayoros, Ryan, Castaneda, Earle, Ziegelmann, Rowe, and Jarrell negligence and gross negligence directly and proximately caused Plaintiffs' pain and suffering, grief, loss of comfort and society, and ultimate death of Ms. Raisbeck.

### **CLAIM THREE**
**Negligent Hiring, Training and Supervision (Monell/Municipal Liability)**
**(Plaintiffs Against VitalCore, Jefferson County, BOCC, JCSO, and Sheriff Marinelli)**

156. Plaintiffs incorporate all preceding paragraphs.

157. VitalCore and Jefferson County Defendants had a duty to exercise reasonable care to hire, train, and supervise their employees and agents in a manner that provided inmates under their care with reasonable medical care and treatment – but they breached that duty.

158. Defendants breached that duty. This breach includes, but is not limited to:

    a.  Employing inadequately trained LPNs, allowing LPN's to do provider-level assessments, and failing to make Health Care Providers available to the LPNs;

    b.  Lack of training for deputies regarding medical emergencies;

    c.  Failing to train staff on anaphylaxis;

    d.  Delays in EMS activation and provider assistance as routine practice and to save expense;

    e.  Chronically understaffing medical operations;

    f.  Failure to maintain or fully complete MARs, logs, and medical documentation;

    g.  Failure to enforce medical policies requiring vitals, escalation, or provider review;

    h.  Consistent failure to monitor detoxifying detainees, and failure to train how to discern the difference between detox and medical emergencies;

    i.  Failure to confirm that protocols are followed;

    j.  Failure of protocols themselves.

159. These failures are not isolated but represent deliberately indifferent willful and wanton policies under *Monell*, *Canton*, *Connick* and Tenth Circuit precedent.

160. VitalCore's and Jefferson County Defendants' deliberate understaffing ensured that no qualified provider was available during Ms. Raisbeck's medical crisis and deterioration.

161. Vitalcore and Jefferson County Defendants knew or should have known of the lack of supervision, experience and training among their employees and agents, and also had reason to know that their employees and agents were likely to harm JCDF detainees in need of medical care, including Ms. Raisbeck.

162. In failing to exercise reasonable care in the training and supervision of their employees and agents regarding how to provide reasonable medical care and treatment, VitalCore and Jefferson County Defendants were negligent.

163. The negligence of VitalCore and Jefferson County Defendants proximately caused Ms. Raisbeck significant physical and mental pain and suffering and other injuries, damages and losses – including death.

164. Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, and without regard to the consequences to Plaintiffs.

165. The failure of Defendants to correct known deficiencies, despite repeated opportunities and multiple prior incidents reflecting obvious risk, constitutes deliberate indifference that was the proximate cause of Ms. Raisbeck's death.

166. Colorado imposes liability where an employer fails to supervise personnel who present foreseeable danger. *Keller v. Koca*, 111 P.3d 445 (Colo. 2005).

167. VitalCore's and Jefferson County Defendants' conduct has proximately caused Plaintiffs' significant pain, suffering, grief, loss of comfort and society, and other injuries, damages and losses arising from the suffering and ultimate death of Ms. Raisbeck.

## CLAIM FOUR
### Wrongful Death pursuant to C.R.S. § 13-21-202 *et.seq.*
### (Jamie Raisbeck Against All Defendants)

168. Plaintiffs hereby incorporate all preceding paragraphs.

169. Plaintiff Jamie Raisbeck is the mother of Ashley Raisbeck.

170. Plaintiff Jamie Raisbeck suffered and continues to suffer economic and non-economic damages due to Defendants' conduct toward Ashley Raisbeck, including but not limited to economic damages for funeral expanses and financial losses due to the financial benefits she may have reasonably expected to receive from Ms. Raisbeck had she lived, and non-economic damages for grief, loss of Ms. Raisbeck's companionship, impairment in the quality of Jamie Raisbeck's life, inconvenience, pain and suffering, and extreme emotional stress.

171. The relationship between a parent and child is a **fundamental liberty interest** protected by the Fourteenth Amendment. *Trujillo v. Bd. of County Comm'rs*, 768 F.2d 1186 (10th Cir. 1985). Government conduct that is **deliberately indifferent or conscience-shocking** to human life violates this right.

172. Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have foreseen was dangerous, or that was done recklessly, without regard to the consequences of Ms. Raisbeck and her mother and flowed directly and proximately from Defendants' conduct.

173. Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another, and were the proximate cause of Ashley Raisbeck's death and the resulting injuries, damages, and losses to Jamie Raisbeck.

## CLAIM FIVE
### DELIBERATE INDIFFERENCE THROUGH ADMINISTRATION OF CONTRAINDICATED MEDICATION
### 42 U.S.C. § 1983 – Fourteenth Amendment
### (Against VitalCore and Medical Defendants)

225. Plaintiffs incorporate all prior allegations.

226. Medical Defendants administered or allowed administration of **cephalexin**, a β-lactam antibiotic **contraindicated** for patients with documented penicillin allergies – especially in the case of past severe reaction like hives and rash. Ms. Raisbeck's JCDF records contained:

(a) a clearly documented severe penicillin allergy including hives and rash;

(b) a prior refusal-of-treatment form in which Ms. Raisbeck rejected cephalexin/Keflex (February 2023);

(c) medical alerts, such as the FDA Black Box Warning for Keflex, requiring alternative

antibiotics or careful monitoring.

227. No provider conducted an exam, reviewed allergies, or reconciled medication orders. No

competent clinician could conclude cephalexin was safe.

228. Medical Defendants failed to monitor Ms. Raisbeck in compliance with the FDA Keflex

Black Box Warning, which states in big bold letters:

"IF THIS PRODUCT IS TO BE GIVEN TO PENICILLIN SENSITIVE PATIENTS
CAUTION SHOULD BE EXERCISED BECAUSE CROSS-HYPERSENSITIVITY
AMONG BETA-LACTAM ANTIBIOTICS HAS BEEN CLEARLY DOCUMENTED
AND MAAY OCCR IN UP TO 10% OF PATIENTS WITH A HISTORY OF
PENICILLIN ALLERGY.  IF AN ALLERGIC REACTION TO CEPHALEXIN
OCCURS, DISCONTINUE THE DRUG.  TREATMENT WITH EPHINEPHRINE
AND OTHER EMERGENCY MEASURES INCLUDING OXYGEN, ITNRAVENOUS
FLUIDS, INTRAVENOUS ANTIHISTAMINES, CORTICOSTEROIDS, PRESSOR
AMINES AND AIRWAY MANAGEMENT, AS CLINICALLY INDICATED."

229. NP Monica Jarrell ordered 1000 mg of Keflex by mouth, twice daily.  The FDA

recommends dosages of 250 mg every 6 hours, or 500 mg every 12 hours.  Ms. Raisbeck

received twice the higher dosage.

230. By administering a dangerous medication and failing to monitor resulting deterioration,

Defendants exposed Ms. Raisbeck to foreseeable risk of gastrointestinal crisis,

dehydration, and shock. Courts recognize such conduct as deliberate indifference.

231. Defendants' conduct was willful, reckless, and the proximate cause of Ms. Raisbeck's

suffering and death.

## CLAIM SIX
## STATE-CREATED DANGER
### 42 U.S.C. § 1983 – Fourteenth Amendment and Due Process Clause
### (Plaintiffs Against All Defendants)

232. Plaintiffs incorporate all prior allegations.

233. Defendants had a duty to protect Ms. Raisbeck from state created harm, even if caused

by private actors.  They breached that duty.

234. Through Defendants actions or omissions, they created a danger to Ms. Raisbeck's life.

This was proximately caused by the government's actions or omissions.

235. Defendants affirmatively increased the danger to Ashley by:
(a) administering a contraindicated antibiotic;
(b) withholding medical evaluation despite visible deterioration;
(c) misclassifying medical crisis as "detox";
(d) excluding Ashley from medical housing and higher observation;
(e) delaying EMS activation;
(f) failing to conduct or record mandatory detox checks;
(g) removing the protections that would have existed outside custody
(h) failure to adequately hire, train and supervise.

236. Ms. Raisbeck belonged to a limited and clearly definable group—detainees held in the

custody and control of JCDF—placing her within the class protected by the state-created

danger doctrine.

237. Under *Currier v. Doran,* 242 F. 3d 905, 923 (10th Cir. 2001), *Armijo v. Wagon Mound*,

159 F.3d 1253, 1262-63 (10th Cir. 1998), and *Estate of B.I.C. v. Gillen*, 761 F.3d 1099

(10th Cir. 2014), these affirmative acts created or amplified danger that she did not face

before custody.

238. Defendants acted with reckless disregard and deliberate indifference, leading directly

and proximately to Ms. Raisbeck's death.

## CLAIM SEVEN
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)
## 42 U.S.C. §§ 12132 and 12114 (Title II)
## (Plaintiffs Against Jefferson County Defendants)

239. Plaintiffs incorporate all prior allegations.

240. Ms. Raisbeck qualified as a "disabled individual" under the ADA because her conditions — dehydration, inability to walk or stand, neurological dysfunction, inability to self-hydrate — **substantially limited major life activities**, including walking, communicating, caring for herself, and bodily function regulation.

241. She was also protected as an individual with Substance Use Disorder (SUD), and should not have faced discrimination on that basis.

242. And yet Defendants did discriminate against Ms. Raisbeck. Defendants' medical care was sub-par because of their disdain for her Substance Use Disorder.

243. JCDF is a "public entity" obligated to **reasonably accommodate** detainees' disabilities.

244. Despite her visible impairments, JCDF:
(a) failed to classify Ms. Raisbeck as medically vulnerable;
(b) denied her placement in medical housing;
(c) failed to provide enhanced observation required for her condition;
(d) misinterpreted medical emergency symptoms as misconduct or detox;
(e) denied access to medical care available to non-disabled detainees;
(f) failed to activate EMS when required by policy
(g) failed to provide adequate services or attention to medical requirements for people suffering from Substance Use Disorder.

245. These failures constituted disability-based exclusion from medical services in violation of the ADA. The denial was **systemic, intentional, and caused foreseeable harm**. Defendants had a duty that was breached.

246. Defendants' actions were the proximate cause of injuries, damages, and losses described herein that Ms. Raisbeck experienced.

## CLAIM EIGHT
### LOSS OF CHANCE
### Colorado Common Law
### (Plaintiffs Against VitalCore and Medical Defendants)

247. Plaintiffs incorporate all prior paragraphs.

248. Ms. Raisbeck had a substantial chance of survival if she had received adequate medical

care.

249. Defendants destroyed or significantly reduced her chance of survival by:
(a) delaying EMS activation by more than one hour after obvious signs of medical crisis;
(b) failing to hydrate or provide IV fluids, and allowing severe dehydration;
(c) failing to obtain vitals;
(d) failing to transfer her to emergency care;
(e) failing to avoid or discontinue contraindicated medication;
(f) allowing Ms. Raisbeck to deteriorate in a cell instead of a medical setting.

250. Under *Sharp v. Kaiser*, these failures support liability for depriving a patient of a

**substantial chance of survival**.

251. Defendants had a duty that was breached.

252. Defendants' actions were the proximate cause for the injuries, damages, and losses to

Ms. Raisbeck described herein.

## CLAIM NINE
### FAILURE TO CLASSIFY, PROTECT, OR HOUSE SAFELY
### 42 U.S.C. § 1983 – Fourteenth Amendment
### (Plaintiffs Against All Defendants)

253. Plaintiffs incorporate all prior paragraphs.

254. JCDF classification policies require that detainees exhibiting medical instability —

vomiting, dehydration, neurological symptoms, difficulty standing — must be placed in

**medical observation or medical housing**.

255. Despite clear indicators, Defendants:
(a) left Ms. Raisbeck in general population housing in a cell by herself;
(b) skipped mandatory detox checks;

(c) failed to elevate monitoring;
(d) failed to place her in a medical unit;
(e) ignored worsening symptoms;
(f) failed to act after deputies reported she "looked really bad."

256. These failures deprived Ashley of protective measures and medical safety required under

constitutional standards.  Defendants had a duty that was breached.

257. Defendants' actions were the proximate cause of injuries, damages, and losses to Ms.

Raisbeck described herein.

## CLAIM TEN
### CIVIL CONSPIRACY
### State Law & 42 U.S.C. § 1983
### (Plaintiffs Against All Defendants)

258. Plaintiffs incorporate all prior paragraphs.

259. Defendants conspired to conceal wrongdoing by agreeing, explicitly or implicitly, to

engage in acts including, but not limited to:

(a) omitting critical findings from the CIRT report;

(b) CIRT investigators pressuring deputies to adopt a false fentanyl narrative;

(c) withholding MARs, logs, and vital-sign records;

(d) sealing Ms. Raisbeck's criminal case to conceal arresting agency records;

(e) publicly releasing false or private medical information;

(f) failing to preserve surveillance video;

(g) destroying or losing medical records.

260. These overt acts furthered a shared objective: to obstruct scrutiny, avoid liability, and

interfere with Plaintiffs' ability to vindicate constitutional rights.

261. Defendants' actions were the proximate cause of injuries, damages, and losses to

Plaintiffs described herein.

**CLAIM ELEVEN**
**UNLAWFUL DISCLOSURE OF PRIVATE HEALTH INFORMATION (PHI)**
**42 U.S.C. § 1983 – Constitutional Privacy and HIPAA**
**Respondeat Superior (County Attorney Sorrells)**
**(Against County Attorney Klymkowsky, Attorney Alexis King, VitalCore and Jefferson**
**County Defendants – Jefferson County Attorneys)**

262. Plaintiffs incorporate all prior paragraphs.

263. Jefferson County owed a duty of care to Ms. Raisbeck to protect her Private Health
Information, and they breached that duty.

264. Defendant Klymkowsky publicly and deliberately, released Ms. Raisbeck's Private
Health Information ("PHI") including alleged drug use history, detox allegations, and
claimed ingestion of fentanyl — to media outlets on May 30, 2024. This was before the
Critical Incident Team Report had been released, so it was not corroborated by the
investigation into Ms. Raisbeck's death.

265. Ms. Raisbeck did not consent to this release. Her medical information was not relevant
to public safety or any governmental function. Disclosure served solely to deflect blame
and shape public narrative.

266. Defendant Sorrells, who is the lead County Attorney in Jefferson County, failed to
properly supervise and train attorneys who worked for her – including Ms. Klymkowsky.
She is vicariously responsible for this release under the doctrine of *respondeat superior.*

267. Although Plaintiffs filed a CGIA Notice of Claim on June 11, 2024 stating this release of
PHI was actionable – District Attorney Alexis King released the same information to the
public in her CIRT letter dated June 20, 2024.

268. Again – there was no public purpose for this release, and it served solely to deflect blame
for Ms. Raisbeck's death from law enforcement and shape a false public narrative – that

Ms. Raisbeck was insignificant due to her Substance Abuse Disorder, and therefore her death is irrelevant. This narrative is discriminatory under the ADA.

269. The release of this information by a prosecutor served no public or prosecutorial purpose, and was done outside the scope of prosecutorial immunity.

270. In both instances, the disclosures were false, malicious, and intended to mislead the public and obstruct accountability.

271. Under *Eastwood v. Dept. of Corrections,* 846 F.2d 627 (10th Cir. 1988) and *A.L.A. v. West Valley City,* 26 F. 3d 989 (10th Cir. 1994), such unjustified release of medical information violates clearly established constitutional privacy rights.

272. Public disclosure of private facts is actionable under *Colorado law. Ozer v. Borquez,* 940 P.2d 371 (Colo. 1997).

273. Government disclosure of confidential personal information violates constitutional privacy rights. *Mangels v. Pena*, 789 F.2d 836 (10th Cir. 1986).

274. Defendants' actions were the legal and proximate cause of further distress and injuries, damages, and losses to Plaintiffs.

## VIII. DAMAGES

275. Plaintiffs incorporate all preceding paragraphs.

276. As a direct and proximate result of Defendants' acts and omissions, Plaintiffs suffered and continue to suffer the following injuries, damages and losses, including but not limited to:

A. Economic Damages

- Medical expenses incurred on December 16, 2023, including emergency services at St. Anthony Hospital.

- Funeral and burial expenses.
- Loss of financial support that Ms. Raisbeck would have provided to her family.

B. Noneconomic Damages

- Loss of companionship, love, affection, comfort, guidance, and emotional support.
- Emotional distress suffered by Ms. Raisbeck's mother and family.

C. Pre-Death Pain and Suffering

- Ms. Raisbeck experienced severe physical pain, fear, and suffering during her
  prolonged medical decline.

D. Punitive Damages

- The conduct of Defendants was willful, wanton, reckless, and in conscious disregard
  of the rights and safety of Ms. Raisbeck, justifying the imposition of punitive
  damages under applicable law.  Such damages will be requested when permitted
  through amendment of the complaint.

E. Attorneys' Fees and Costs

- Plaintiffs are entitled to attorneys' fees and costs under 42 U.S.C. § 1988 and
  applicable Colorado statutes.

F. All Other Recoverable Damages

- Plaintiffs seek all damages allowed under Colorado law, federal law, and any
  applicable statute or doctrine.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against each of the Defendants, and award them all relief as allowed by law and equity, including but not limited to the following, as follows:

(a)  All appropriate relief in equity and law;

(b)  Declaratory relief and other appropriate equitable relief;

(c)  Economic and non-economic losses on all claims allowed by law;

(d)  Compensatory and consequential damages, including but not limited to those for past and future losses, damages for emotional distress, loss of enjoyment of life, humiliation, pain and suffering on all claims allowed by law, funeral and related economic expenses, etc. in an amount to be determined at trial;[8]

(e)  Punitive damages on all claims permitted by law and in an amount to be determined at trial;

(f)  For damages under 42 U.S.C. § 1983 and § 1988;

(g)  Attorney's fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

(h)  Pre and post judgment interest at the highest lawful rate; and

(i)  Any further relief as justice requires and that this Court deems just and proper.

---

[8]  Plaintiff's notify Defendants that, though a claim for exemplary damages on Plaintiffs' state law claims cannot be included in the initial complaint, they intend to move to amend the complaint to add exemplary damages when permitted.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 9th day of December 2025,


SPRINGSTEEN LAW FIRM, LLC

/s/ Anita M. Springsteen
Anita Ms. Springsteen, #35692
Attorney for Plaintiffs

PO Box 19700
Denver, CO 80219
720-838-3421(p)
303-573-8417 (f)
anita@springsteenlaw.com